496 S.E.2d 198

STATE of West Virginia ex rel. PAUL and Chris B., Petitioners,

v.

Honorable George W. HILL, Jr., Judge of the Circuit Court of Wood County; Pete and Cynthia L. S.; and Natasha Colette B., Anatoli Josef B., Alevhnia Marie B., and Olya Tess B., Respondents.

No. 24438.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 15, 1997.

Decided Oct. 24, 1997.

**250**

David Allen Barnette, Monika J. Hussell, Jackson & Kelly, Charleston, for Petitioners.

Michele Rusen, Parkersburg, for Respondents Pete and Cynthia L. S.

Brian D. Yost, Tom Price, Holroyd, Yost & Evans, Charleston, for Amici Curiae Childplace, Inc., and Burlington United Methodist Family Services, Inc.

Darrell V. McGraw, Jr., Attorney General, Barbara L. Baxter, Assistant Attorney General, Charleston, for West Virginia Department of Health and Human Resources.

Susan D. Simmons, Simmons & Simmons, Elizabeth, Guardian ad Litem for Respondent Minor Children, Natasha Colette B., Anatoli Josef B., Alevhnia Marie B., and Olya Tess B.

DAVIS, Justice:

In this original proceeding for a writ of prohibition, the petitioners, Paul and Chris B.,[1] request this Court to prohibit the respondent judge, the Honorable George W. Hill, Jr., Judge of the Circuit Court of Wood County, from enforcing his August 20, 1997, order. In that order, Judge Hill concluded that the respondents, Pete and Cynthia L. S.,[2] should receive the legal and physical custody of the respondent children, Natasha Colette B., Anatoli Josef B., Alevhnia Marie B., and Olya Tess B., pending further investigation by the West Virginia Department of Health and Human Resources. The circuit court deemed further inquiry appropriate given the S family's prior allegations that the B family had abandoned their four adoptive children by placing them in respite care with the S family and by making arrangements to re-place the children through the Texas adoption agency through which they had adopted them. We issued a rule to show cause. We now grant as moulded the writ of prohibition.

I.

**FACTUAL AND PROCEDURAL HISTORY**

The facts underlying this proceeding began in approximately May, 1997. At that time, Paul and Chris B., having earlier decided to adopt four children from Russia, traveled to that country to meet their soon-to-be adoptive children and to finalize the adoption arrangements.[3] Throughout the adoption process, the B family had worked with the Gladney Center, an international adoption agency located in Fort Worth, Texas, and Gladney representatives had assured them that the Russian children would have no substantial emotional problems.[4] On May

---

1. We adhere to our usual practice in family law cases involving sensitive matters and do not use the last names of the parties. *See State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 559 n. 2, 490 S.E.2d 642, 646 n. 2 (1997); *Elmer Jimmy S. v. Kenneth B.*, 199 W.Va. 263, 264 n. 1, 483 S.E.2d 846, 847 n. 1 (1997); *In the Interest of Tiffany Marie S.*, 196 W.Va. 223, 226 n. 1, 470 S.E.2d 177, 180 n. 1 (1996).

2. Hereinafter, for ease of reference, the parties will be referred to by their last initials (*e.g.*, the Bs and the Ss).

3. Mrs. *B* does not speak Russian; Mr. *B* speaks limited Russian.

4. The possibility that these children may have emotional difficulties was of particular concern to the *B* family given the various emotional problems suffered by children who have lived in orphanages prior to their adoption.

15, 1997, the *Bs'* adoption of the four siblings, Natasha Colette, Anatoli Josef, Alevhnia Marie, and Olya Tess,[5] was finalized in Russia. After retrieving the children from the orphanage in which they had been residing, the *Bs* and their four Russian children resided temporarily in Russia, first with a Russian host family and, later, in a youth hostel, to permit the new family unit to become acquainted with one another before returning to the United States. The *Bs* claim that once the adoption had been finalized, the orphanage informed them that Natasha had exhibited some anti-social behavior and had had occasional outbursts. While residing in Russia, the *Bs* experienced difficulty interacting with the children, and the children would not obey them.

Upon their return to Parkersburg, West Virginia, the *Bs* and their four Russian children were reunited with the *Bs'* other children.[6] The *Bs* claim that, from the beginning, the relationship between the four Russian siblings and the *Bs'* other children was strained, at best. In this regard, the *Bs* indicate that the Russian children acted violently towards themselves, each other, and the other *B* children, would not obey, and could not be disciplined. After meeting with a family counselor in early July, 1997, the *B* family learned that the Russian siblings likely suffered from "attachment displacement disorder," an emotional disturbance frequently diagnosed in children who have been adopted from orphanages in for-

eign countries. The counselor also opined that the Russian children may or may not ever completely recover from this disorder and that the *B* family had little hope of establishing a cohesive family that would include these four siblings.

At this juncture, the *Bs* concluded that the Gladney Center had misrepresented the emotional and mental condition of the Russian children.[7] Determining that they could not continue to jeopardize their family stability and the safety of their other children,[8] the *Bs* pursued the option of relinquishing their parental rights to the Russian siblings and re-placing them with the Gladney Center for a second adoption. The arrangements with the Gladney Center apparently have contemplated that, unlike the *B* family situated in Parkersburg, West Virginia, Gladney, in Texas, can secure the appropriate treatment for children with such severe attachment displacement disorder. These preparations also contemplate the continuation of the sibship unit by placing all four children in the same adoptive home.

Toward the end of July, 1997, Mr. *B* was scheduled to take an out-of-town weekend trip. Based in large part upon Mrs. *Bs'* inability to control their newly adopted children and fearing for her own safety and that of her remaining children, the *Bs* sought temporary respite care[9] for their Russian children during Mr. *Bs'* absence. The *B* family, having contacted Burlington United Methodist Family Services, Inc., was advised

---

5. The children's ages are as follows: Anatoli Josef is nine years old; Natasha Colette is eight years old; Alevhnia Marie is seven years old; and Olya Tess is six years old.

6. The record indicates that the *Bs* have three other children who joined their family by adoption.

7. The *Bs* deny allegations that they are pursuing litigation against the Gladney Center as a result of this alleged misrepresentation, and state that they have not filed, and do not intend to pursue, a "wrongful adoption" suit against Gladney.

8. Among the bizarre behavior exhibited by the four Russian siblings, the *Bs* cite "pack behavior"; fighting with and biting of each other and the *Bs'* other children; self-abuse; soiling their

clothes; and various instances of violence and rage.

9. Typically, "respite care" envisions the short-term placement of a child outside of the child's home environment in order to permit the child's parent(s) or guardian(s) and the child a temporary reprieve from a stressful familial situation. Respite care is often sought by families who have children with severe physical, emotional, or mental difficulties as a type of "cooling off" period before the family relationship becomes irreparably damaged. Although foster care also involves the placement of a child outside of his/her home environment, "foster care" generally contemplates a more lengthy period of separation between a child and his/her family. Foster care is often employed as a temporary placement for children whose parent(s) or guardian(s) have been charged with child abuse and/or neglect or who are awaiting final adoptive placement.

to contact the Ss to see if they could provide such care. Mr. and Mrs. S, who have provided respite care to numerous children,[10] agreed to temporarily house the Bs' four Russian children from Thursday, July 17, 1997, to Sunday, July 20, 1997.[11]

On July 17, 1997, the B family delivered their four Russian children to the S household.[12] The S family indicates that, while the children exhibited some emotional disturbance, they were not violent or in any other way disobedient during their stay. On the following Sunday, July 20, 1997, the B family requested the S family to extend the respite care, to which the Ss agreed. The next day, Mrs. S contacted the Gladney Center and inquired whether she and her husband could adopt these children. Gladney, in turn, contacted the B family who strongly opposed the proposal, particularly because they were purchasing a house in the same subdivision where the S family lives and feared the consequences of living in such close proximity to these children. In addition, the B s disapproved permanent adoptive placement of the children in the Parkersburg, West Virginia, area because this region is not equipped with services to meet the needs of children with attachment displacement disorder.[13]

On Wednesday, July 23, 1997, the B family traveled to the S household to pick up their four children, as the Bs believed the parties had previously agreed to extend the respite

care to this date.[14] En route, the Bs called the Ss to let them know they were on their way; a person in the S household indicated that the children were not at home because Mrs. S had taken all of the children to the library. Upon approaching the S household, the Bs observed Mr. S driving quickly through the neighborhood with the Bs' children in his car. Apparently, Mr. S continued his journey, without stopping, even though the Bs attempted to flag him down.[15] The Bs then called the Wood County Sheriff's Department, and, when the police arrived, proceeded to the S residence. At the S household, the Bs were informed that Mr. S had taken the children out for ice cream. Approximately one hour later, the sheriff's department was informed, by the Ss' attorney, that Mr. and Mrs. S had obtained an emergency temporary custody order covering these children.[16]

On July 25, 1997, the Ss filed a "Petition for Appointment of Guardian and for Intervention by the West Virginia Department of Health and Human Resources" [hereinafter abuse and neglect petition], essentially requesting the Circuit Court of Wood County to appoint a guardian *ad litem* for the children and charging the B family with abandonment of the children constituting abuse and neglect. During the July 25, 1997, hearing of this matter, counsel for the B family contended that the S family lacked standing

**10.** It appears from the record that, at the time they accepted the four B children into their home for respite care, the Ss already had seven children in their home who had joined their family by adoption.

**11.** The S family speaks minimal Russian because they previously had housed a child of Russian descent. In addition, a Russian exchange student, who speaks both English and Russian, is currently residing with the Ss.

**12.** The Ss represent that only Mrs. S met the Bs when they brought their four children to the S home for respite care as Mr. S was not at home at that time.

**13.** The Bs had, in fact, sought treatment for their four Russian children from a mental health professional in the Parkersburg area. They were denied services, however, when the professional

ascertained the nature of the children's problems and determined that he could not treat them.

**14.** By contrast, the Ss claim that, although they had agreed to continue providing respite care for the Bs' four children, the parties had not agreed upon an ending date for such care.

**15.** Mrs. S claims that she originally had planned to take the four B children to the library in addition to her other children, but, at the last minute, was concerned that she could not handle all of the children by herself. Mr. S then agreed to take the four B children for ice cream. He claims that he did not stop when the Bs attempted to "flag him down" because he had never met them and did not know who they were.

**16.** An affidavit by Mrs. S attached to the emergency custody order indicates that the S family wished to "safeguard the well-being" of the four B children and intended to "file a Petition seeking [their] adoption."

to charge the *Bs* with abuse and neglect by abandonment, claiming that the *Bs'* intentions to relinquish their parental rights and to re-place the children for adoption did not rise to the level of abandonment. Circuit Court Judge Hill, viewing the best interests of the children, decided otherwise and ordered an inquiry by the West Virginia Department of Health and Human Resources [hereinafter DHHR]. The court also granted legal custody of the four children to the DHHR and physical custody to the *S* family pending resolution of the matter. However, by final order dated August 20, 1997, Judge Hill granted both legal and physical custody of the children to the *S* family until the DHHR had completed its report and the court had an opportunity to hold an evidentiary hearing.[17]

On September 2, 1997, the *Bs* petitioned this Court for a writ of prohibition to prevent Judge Hill from enforcing his order and to permit them to continue with their planned relinquishment and re-placement. We issued a rule to show cause and now proceed to determine the propriety of the requested relief.[18]

## II.

## DISCUSSION

Before this Court, the petitioners request that we prohibit the respondent Judge Hill from enforcing his order vesting legal and physical custody of these four children with the *S* family pending investigation of the *Ss'* charges that the *Bs'* intention to relinquish their parental rights to these children and to re-place them for adoption constituted abuse and neglect by way of abandonment. Following a brief discussion of the appropriate standard of review, we address the merits of the petitioners' contentions.[19]

---

**17.** The record indicates that the DHHR could not approve the *S* home as an appropriate foster care placement for the four *B* children, in part, because the number of children living in the *S* household exceeded the permissible number of children contemplated by the DHHR's foster care standards. As a result of the DHHR's concerns over potential liability problems under these circumstances, Judge Hill vested both legal and physical custody of the *B* children in the *Ss*.

**18.** Since our acceptance of this original jurisdiction proceeding, we have received a report by the DHHR summarizing that agency's inquiry into the parties' allegations. The report indicates that the *S* family has an acquaintance who is originally from Moscow and who served as an interpreter during the case worker's interview with the four *B* children. The children reported various instances of emotional cruelty and physical mistreatment while residing in the *B* household. Believing the interpreter to be biased in favor of the *S* family, the case worker requested a second, neutral interpreter to assist with a second interview of the children. The second interview provided some indication that the children had been coached to relate various stories of abusive treatment and inappropriate discipline to the case worker if they wanted to remain in the *S* household.

The case worker further determined that the *B* family and the Gladney Center had been cooperating to ensure appropriate treatment for the children's attachment displacement disorder upon their re-placement in Texas. Gladney also appears to have found a new adoptive family for the children that would permit the four siblings to remain together. The new adoptive family seems to be very eager to accept these children into their home and appears to understand and appreciate the difficulties that may arise in caring for these emotionally challenged children. In addition, the new adoptive family has demonstrated a great appreciation for the children's ethnic heritage as they have been familiarizing themselves with Russian culture and learning to speak Russian. Further evidence indicates that the *B* family has received approval from the West Virginia Deputy Compact Administrator of the Interstate Compact on the Placement of Children to proceed with the proposed relinquishment and re-placement.

Finally, inquiry into the appropriateness of the *S* family as a potential adoptive family for the four children led the case worker to believe that if the *S* family had requested, through the DHHR, to provide foster care for these children, the DHHR would not have permitted such an arrangement. Inquiry into the *S* family's history indicated several previous allegations of abuse and neglect against that family and against children residing in that home, although the record does not indicate that any of these charges is currently under investigation.

**19.** At this juncture, we note that the West Virginia Department of Health and Human Resources [DHHR] participated in the presentation of this original jurisdiction proceeding before this Court. In addition, Childplace, Inc., and Burlington United Methodist Family Services, Inc., appeared as Amici Curiae herein. As both the DHHR and Amici Curiae present arguments concurring with those asserted by the petitioners, we will hereinafter refer collectively to all of these parties' arguments as those advanced by the *Bs*.

## A. Standard of Review

■ The right to relief through the original jurisdiction proceeding of prohibition is statutorily recognized in this State. W.Va. Code § 53–1–1 (1923) (Repl.Vol.1994) provides that "[t]he writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers." Stated otherwise, "[a] writ of prohibition ... will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. *W.Va.Code*, 53–1–1." Syl. pt. 2, in part, *State ex rel. Peacher v. Sencindiver*, 160 W.Va. 314, 233 S.E.2d 425 (1977). Accordingly, "[a]lthough a court has jurisdiction of the subject matter in controversy and of the parties, if it clearly appears that in the conduct of the case it has exceeded its legitimate powers with respect to some pertinent question a writ of prohibition will lie to prevent such abuse of power." Syl. pt. 2, *State ex rel. State Road Comm'n v. Taylor*, 151 W.Va. 535, 153 S.E.2d 531 (1967). *See also* Syl. pt. 1, *White Sulphur Springs, Inc. v. Ripley*, 124 W.Va. 486, 20 S.E.2d 794 (1942) ("Under Code, 53–1–1, a trial court having jurisdiction of a cause of action and of the parties thereto, may, nevertheless, be prohibited from further proceeding therein, when in so doing it exceeds its legitimate powers.").

Furthermore, while "prohibition does not lie to correct errors committed by a court which is acting within its jurisdiction, or where the existence of jurisdiction depends on controverted facts which such court is competent to determine ... 'the writ properly issues where an erroneous decision on a question of law operates as an unlawful assumption of jurisdiction.'" *State ex rel. Zirk v. Muntzing*, 146 W.Va. 878, 894, 122 S.E.2d 851, 860 (1961) (quoting 73 C.J.S. *Prohibition* § 12). *See also State ex rel. Charleston Mail Ass'n v. Ranson*, 200 W.Va. 5, 9, 488 S.E.2d 5, 9 (1997) (" 'The rationale behind a writ of prohibition is that by issuing certain orders the trial court has exceeded its jurisdiction, thus making prohibition appropriate.' " (quoting *State ex rel. Allen v. Bedell*, 193 W.Va. 32, 36, 454 S.E.2d 77, 81 (1994) (Cleckley, J., concurring))).

Traditionally, we have viewed the writ of prohibition as an extraordinary remedy to be granted in only the most extraordinary cases. *See, e.g., State ex rel. West Virginia Div. of Natural Resources v. Cline*, 200 W.Va. 101, 105, 488 S.E.2d 376, 380 (1997); *State ex rel. Suriano v. Gaughan*, 198 W.Va. 339, 345, 480 S.E.2d 548, 554 (1996); *State ex rel. United States Fidelity & Guar. Co. v. Canady*, 194 W.Va. 431, 436, 460 S.E.2d 677, 682 (1995); *State ex rel. Doe v. Troisi*, 194 W.Va. 28, 31, 459 S.E.2d 139, 142 (1995). In this regard, "[i]t is well established that prohibition does not lie to correct mere errors and cannot be allowed to usurp the functions of appeal, writ of error, or certiorari.... [Where] the lower court had jurisdiction of the ... proceedings, ... unless it so exceeded its legitimate powers as to vitiate that jurisdiction, prohibition is not the proper remedy." *Handley v. Cook*, 162 W.Va. 629, 631, 252 S.E.2d 147, 148 (1979) (citations omitted). *See also State ex rel. Williams v. Narick*, 164 W.Va. 632, 635, 264 S.E.2d 851, 854 (1980) ("[T]his Court has specifically stated that the writ [of prohibition] does not lie to correct 'mere errors' and that it cannot serve as a substitute for appeal, writ of error or certiorari." (citations omitted)). Therefore, "[t]o justify this extraordinary remedy, the petitioner has the burden of showing that the lower court's jurisdictional usurpation was clear and indisputable and, because there is no adequate relief at law, the extraordinary writ provides the only available and adequate remedy." *State ex rel. Allen v. Bedell*, 193 W.Va. at 37, 454 S.E.2d at 82. Having set forth the applicable standard of review, we proceed now to a determination on the merits as to whether the petitioners satisfy these criteria for the issuance of a writ of prohibition.

## B. Determination of Issues

■ In the proceedings presently before this Court, the petitioners contend that the circuit court did not have jurisdiction to entertain the abuse and neglect petition filed by the *S* family. The *Bs* argue that the *Ss* did not have standing to file the abuse and neglect or custody petitions in the circuit court,

and, therefore, the circuit court did not have jurisdiction over those proceedings. W.Va. Code § 49–6–1(a) (1992) (Repl.Vol.1996) permits a "reputable person" to file a petition alleging abuse and neglect, but this section also requires the petitioner to set forth specific facts evidencing such allegations. Mere conclusory statements that abuse or neglect has occurred will not suffice. *State v. Scritchfield,* 167 W.Va. 683, 280 S.E.2d 315 (1981). The *Bs* contend that the abuse and neglect petition filed by the *S* family in this case did not manifest sufficient facts to support their allegations of abandonment rising to the level of abuse and neglect. Rather, the *B* family suggests that, under the facts of this case, it is impossible for the conduct alleged by the *Ss* (the *Bs'* intent to relinquish the children and to re-place them for adoption) to constitute abuse and neglect by abandonment in West Virginia.[20]

The *Bs* also dispute the circuit court's finding that their intent to relinquish their parental rights to their four children and to re-place them for adoption through the Gladney Center constitutes abandonment rising to the level of abuse and neglect. Rather, they contend that the statutory definition of abuse and neglect contained in W.Va.Code § 49–1–3(c) (1994) (Repl.Vol.1996) neither specifically defines abandonment nor indicates that an intent to relinquish parental rights incident to an adoption proceeding constitutes abuse and neglect. If this provision were construed to apply to adoption proceedings, the *Bs* argue that adoption would practically cease to exist in this State because every parent contemplating a relinquishment of his/her parental rights could be charged with abuse and neglect.

The *S* family replies that they clearly had standing to bring the instant abuse and neglect petition pursuant to W.Va.Code § 49–6–1(a). This provision grants a "reputable person" standing to file such a petition. The *Ss* submit that, as respite care providers, they have had much experience in caring for children and are in a good position to recog-

nize signs of abuse or neglect. In this regard, they also assert that respite and foster care providers having knowledge of abuse or neglect have a duty to report such mistreatment to the appropriate authorities. The *S* family states further that, given their knowledge of these particular children and their treatment while they resided in the *B* household, the *Ss* were proper parties to bring this petition. Moreover, the *Ss* reply that the circuit court has jurisdiction to entertain allegations of abandonment rising to the level of abuse and neglect because the court has jurisdiction to protect and promote the best interests of children. *See In re Jeffrey R.L.,* 190 W.Va. 24, 435 S.E.2d 162 (1993). Accordingly, the *Ss* assert that the circuit court properly exercised jurisdiction over the underlying abuse and neglect proceedings.

The *Ss* contend finally that abandonment has previously been held to constitute abuse and neglect. *See* W.Va.Code § 49–1–3(e) (defining "imminent danger" as including abandonment); *In re Adoption of Mullins by Farley,* 187 W.Va. 772, 421 S.E.2d 680 (1992) (per curiam). They further assert that the *Bs'* intention to relinquish their parental rights and to re-place the children for adoption constitutes abandonment as a parent without actual custody of his/her child has been found capable of abandoning such child. *In re Katie S.,* 198 W.Va. 79, 479 S.E.2d 589 (1996); *In re Christine Tiara W.,* 198 W.Va. 266, 479 S.E.2d 927 (1996) (per curiam). Under the circumstances of this case, the *Ss* maintain their allegations that the *Bs'* intent to relinquish their parental rights and to send their children to Texas for adoptive placement would place the children in "imminent danger" of severe psychological damage, and submit that these allegations constitute abandonment for abuse and neglect purposes.

Our resolution of the standing and jurisdiction issues necessitates an inquiry into the current law of this State as it relates to abuse and neglect proceedings. W.Va.Code § 49–6–1(a) (1992) (Repl.Vol.1996) permits

---

**20.** The *Bs* further challenge the *Ss'* standing in this case claiming that the *Ss* had a contractual agreement whereby they agreed not to interfere with the parental rights of those parents whose children had been placed with them for respite care. Because the existence of such a contract is not clear from the record presently before this Court and because we can resolve this matter on other grounds, we decline the *Bs'* invitation to address further this particular argument.

256

the filing of a petition alleging the abuse and/or neglect of a child:

> If the state department [of health and human resources] *or a reputable person* believes that a child is neglected or abused, the department *or the person* may present a petition setting forth the facts to the circuit court in the county in which the child resides, or to the judge of such court in vacation. The petition shall be verified by the oath of some credible person having knowledge of the facts. The petition shall allege specific conduct including time and place, how such conduct comes within the statutory definition of neglect or abuse with references thereto, any supportive services provided by the state department to remedy the alleged circumstances and the relief sought[.]

(Emphasis added). Clearly, then, this statute permits not only the DHHR but also an individual who believes that a child is being abused or neglected to institute proceedings to investigate these allegations.

■ Under the facts of this case, we find that the *Ss* were proper parties to file an abuse and neglect petition and, therefore, had standing to do so. Generally speaking, "[s]tanding is an element of jurisdiction over the subject matter." 21A Michie's Jurisprudence *Words & Phrases* 380 (1987) (citing *Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.*, 611 F.Supp. 1542 (E.D.Va. 1985)). More specifically, standing refers to one's ability to bring a lawsuit because he/she has "such a personal stake in the outcome of the controversy as to insure the concrete adverseness upon which the court depends for illumination of the questions in the case." 14A Michie's Jurisprudence *Parties* § 18 (1989) (citing *Christman v. American Cyanamid Co.*, 578 F.Supp. 63 (N.D.W.Va.1983)). *See also Coleman v. Sopher,* 194 W.Va. 90, 95–96 n. 6, 459 S.E.2d 367, 372–73 n. 6 (1995) (explaining elements comprising standing). While the *Bs* contend that the petition filed by the *Ss* lacked the factual sufficiency required by the above-quoted statute, we hold

that the inadequacy of allegations contained in an abuse and neglect petition does not, in and of itself, abrogate one's standing to file such a petition pursuant to W.Va.Code § 49–6–1(a) (1992) (Repl.Vol.1996).[21]

Among the enumerated goals of the child welfare laws of this State are the "[p]rovi[sion] for [the] early identification of problems of children and their families, and ... appropriate[ responses thereto] with measures and services to prevent abuse and neglect" and the "[p]rotect[ion of] the welfare of the general public." W.Va.Code § 49–1–1(a)(8), (10) (1997) (Supp.1997). By permitting an individual who believes that abuse and/or neglect is occurring, or has occurred, to file a petition alleging such circumstances, and by requiring this person to also have sufficient knowledge of the facts underlying this belief to verify the petition, the statutory framework attempts to protect parents, custodians, guardians, and care givers from unsubstantiated charges while permitting the filing of petitions seeking to protect the health, safety, and well-being of children.

The *Ss* contend that, at the time they first received the four *B* children into their home, they had misgivings about whether the *Bs* had appropriately provided for the children's needs in terms of food and clothing. While caring for these children, the *Ss* noticed that the children seemed to be afraid of soap and learned that their "discipline" at the *Bs'* home may have included "washing the children's mouths out with soap" when they spoke their native Russian instead of English. The *Ss* also had discovered that the *Bs* were attempting to relinquish their parental rights and to re-place these children for adoption through the Gladney Center. Furthermore, the parties indicate that, during the initial period of respite care, they were uncertain as to whether the Gladney Center had located a permanent adoptive placement for the children in Texas. As a result, the *Ss* maintain that they were concerned that the sibship may be separated and that the chil-

---

**21.** We do not, at this juncture, pass upon the adequacy of the allegations of abuse and neglect contained in the *Ss'* petition. Instead, we note generally that while such factual allegations may not sufficiently allege abuse and neglect at the time a particular petition is filed, the petitioner may later amend his/her petition to include more specific grounds. *See* W. Va. R. Proc. for Child Abuse & Neglect Rule 19.

dren would be placed in different foster homes pending permanent placement. Separation of these siblings would not only have been emotionally devastating for them but also would have been contrary to this State's public policy of attempting to unite siblings in foster care placements. *See* W.Va.Code § 49–2–14 (1995) (Repl.Vol.1996). Therefore, given the *Ss'* beliefs about the children's care and treatment during their residence with the *B* family, and the *Ss'* personal familiarity with and observations of the children during their provision of respite care, we find that the *Ss* were proper parties and had standing to file an abuse and neglect petition in this case.

■ Although not as definitely ascertainable as the issue of standing, we also find that the Circuit Court of Wood County had jurisdiction over the basic abuse and neglect petition filed in this case. While not explicitly stated in the abuse and neglect statutes, we previously have recognized that circuit courts have "original jurisdiction of all cases coming within the terms of the [child welfare] act," which serves to protect "delinquent, dependent *and neglected children.*" *Locke v. County Court of Raleigh County,* 111 W.Va. 156, 158, 160, 161 S.E. 6, 7 (1931) (emphasis added). Therefore, it appears that the circuit court properly exercised jurisdiction over the abuse and neglect proceeding in this case as such proceeding comes within the child welfare laws of this State. *See* W.Va.Code § 49–1–1, *et seq.*

In addition, our Constitution provides both specific grants of power to circuit courts and a general, more inclusive jurisdictional provision encompassing grants of power which are intended by the Legislature, but which have not been specifically enumerated. Article VIII, Section 6, of the West Virginia Constitution states, in part, that "[c]ircuit courts shall also have such other jurisdiction, authority or power, original or appellate or concurrent, as may be prescribed by law." *See also* W.Va.Code § 51–2–2 (1978) (Repl. Vol.1994) (same). In this manner, it may be inferred that if one may file a petition with the circuit court alleging abuse or neglect of a child and if hearings are to be had in the circuit court with respect to that petition,

then the circuit court logically should possess the inherent jurisdiction to entertain the petition and to conduct such proceedings. *See* W.Va.Code § 49–6–1. Thus, under this interpretation of the circuit court's jurisdiction in abuse and neglect proceedings, the circuit court's exercise of jurisdiction was proper in this case.

Finally, the circuit court had jurisdiction to entertain the abuse and neglect proceeding under the doctrine of *parens patriae.* We have acknowledged that the State, in its role of *parens patriae,* has a duty to safeguard children:

> While parents enjoy an inherent right to the care and custody of their own children, the State in its recognized role of *parens patriae* is the ultimate protector of the rights of minors. The State has a substantial interest in providing for their health, safety, and welfare, and may properly step in to do so when necessary.... This *parens patriae* interest in promoting the welfare of the child favors preservation, not severance, of natural family bonds.... The countervailing State interest in curtailing child abuse is also great. In cases of suspected abuse or neglect, the State has a clear interest in protecting the child and may, if necessary, separate abusive or neglectful parents from their children.

*In the Interest of Betty J.W.,* 179 W.Va. 605, 608, 371 S.E.2d 326, 329 (1988) (citations omitted).

Tempered with the State's *parens patriae* interest is the court's obligation to consider the "best interests of the child [as] paramount." *In re Jeffrey R.L.,* 190 W.Va. 24, 32, 435 S.E.2d 162, 170 (1993). *See also Carter v. Carter,* 196 W.Va. 239, 246, 470 S.E.2d 193, 200 (1996) (recognizing paramount importance of best interests of child). This judicial duty has also been characterized as a *parens patriae* role: "[t]his Court cannot ... ignore its *parens patriae* duty to protect the best interests of [the child]." *State of Florida, Dep't of Health & Rehabilitative Servs. ex rel. State of West Virginia, Dep't of Human Servs., Div. of Social Servs. v. Thornton,* 183 W.Va. 513, 519, 396 S.E.2d 475, 481 (1990) (per curiam) (citation omitted). During the proceedings below, the

court specifically recognized, in ruling upon the allegations of abuse and neglect, that "the interest of the child is just unsurpassed by anything" and that "[t]he primary issue is always the welfare of the child." Thus, the circuit court, in its conduct of proceedings to ensure the safety and well-being of the *Bs'* four children, properly exercised its jurisdiction by entertaining the *Ss'* abuse and neglect petition. Having found various rationales for vesting jurisdiction in the circuit court to entertain abuse and neglect proceedings, we hold that a circuit court has jurisdiction to entertain an abuse and neglect petition and to conduct proceedings in accordance therewith as provided by W.Va.Code § 49–6–1, *et seq.*

■ Finally, the *Bs* contend that the circuit court exceeded its jurisdiction in the underlying proceedings because a parent's intent to relinquish his/her parental rights in anticipation of placing a child for adoption does not constitute abandonment for abuse and neglect purposes. In this regard, we agree with the *Bs*. During the hearing below, the circuit court determined that "[r]elinquishing children constitutes neglect or abandonment." Although the circuit court did have jurisdiction of the basic abuse and neglect petition filed by the *Ss* and of the proceedings held in accordance therewith, the court exceeded such jurisdiction when it created a new basis for finding abuse and neglect: voluntary relinquishment of parental rights incident to adoption proceedings.

In W.Va.Code § 49–1–3 (1994) (Repl.Vol. 1996), the Legislature very explicitly set forth definitions for abuse and neglect. An " '[a]bused child' " is defined in W.Va.Code § 49–1–3(a) as:

a child whose health or welfare is harmed or threatened by:

(1) A parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home; or

(2) Sexual abuse or sexual exploitation; or

(3) The sale or attempted sale of a child by a parent, guardian or custodian in violation of section sixteen [§ 48–4–16], article four, chapter forty-eight of this code.

In addition to its broader meaning, physical injury may include an injury to the child as a result of excessive corporal punishment.

Similarly, subsection (g) defines a " '[n]eglected child' " as a child:

(1) ... (A) Whose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care or education, when such refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian; or

(B) Who is presently without necessary food, clothing, shelter, medical care, education or supervision because of the disappearance or absence of the child's parent or custodian[.]

W.Va.Code § 49–1–3(g)(1). More generally, " '[c]hild abuse and neglect' " or " 'child abuse or neglect' " refers to "physical injury, mental or emotional injury, sexual abuse, sexual exploitation, sale or attempted sale or negligent treatment or maltreatment of a child by a parent, guardian or custodian who is responsible for the child's welfare, under circumstances which harm or threaten the health and welfare of the child." W.Va.Code § 49–1–3(c).

None of these definitions encompasses the conduct of the *Bs* in this case, that is the voluntary relinquishment of parental rights incident to placement for adoption. Thus, we hold that a parent's relinquishment of his/her parental rights either in anticipation of future adoption proceedings or as a part of previously initiated adoption proceedings does not constitute abandonment for abuse and neglect purposes.[22] Accordingly, the cir-

---

**22.** We note, though, that our holding today is in no way intended to abrogate our prior holding that a parent may not relinquish his/her parental rights while he/she is the respondent or defendant in a child abuse and neglect proceeding. *See* Syl. pt. 2, *Alonzo v. Jacqueline F.*, 191 W.Va.

cuit court erred in concluding that the *Bs'* intention to relinquish their parental rights to their children constituted abandonment or abuse and neglect.[23]

■ Neither does the *Bs'* contemplated relinquishment constitute abandonment under the pertinent statutory provisions governing adoption. In fact, such a characterization would negate the entire intent and effect of the recent legislative amendments to the adoption statutes. First and foremost, the adoption procedures of this State require, as a necessary prerequisite to placing a child for adoption, the child's parent to execute either a relinquishment of parental rights or a consent to adoption. W.Va.Code § 48–4–3 (1997) (Supp.1997) provides exceptions to the relinquishment/consent requirement only where a parent's parental rights have previously been terminated; where the parent has abandoned his/her child as that term is defined in the adoption statutes; where the spouse of one parent is seeking to adopt that parent's child; or where the parent is found to be under a disability and is incapable of granting such relinquishment or consent. In every other instance, a relinquishment or consent is required before the adoption may proceed.[24] Therefore, because none of these exceptions exempts the *Bs* from the relinquishment requirement, they must execute a relinquishment of their parental rights as a prerequisite to re-placing their Russian children for adoption. Nevertheless, under the circuit court's characterization of relinquishment, the *Bs* could be charged with abuse and neglect simply by adhering to the statutory requirements for adoption. We simply cannot approve such an ironic result.

Furthermore, the adoption laws specifically define abandonment as that term is used in the context of adoption proceedings. As this definition pertains to the facts presently before us:

(a) Abandonment of a child over the age of six months shall be presumed when the birth parent:

(1) Fails to financially support the child within the means of the birth parent; and

(2) Fails to visit or otherwise communicate with the child when he or she knows where the child resides, is physically and financially able to do so and is not prevented from doing so by the person or authorized agency having the care or custody of the child; Provided, That such failure to act continues uninterrupted for a period of

---

248, 445 S.E.2d 189 (1994) ("Where a child abuse and neglect proceeding has been filed against a parent, such parent may not confer any rights on a third party by executing a consent to adopt during the pendency of the proceeding.").

23. While the *Ss* bolster their argument that the *Bs'* intended conduct constitutes abandonment rising to the level of abuse and neglect by referring to the "imminent danger" phraseology contained in W.Va.Code § 49–1–3(e), we cannot base our decision upon this rationale. The situations in which this phrase is utilized throughout the abuse and neglect statutes do not contemplate the fact pattern presently before this Court. *See, e.g.,* W.Va.Code § 49–2D–3 (1989) (Repl.Vol. 1996) (dispensing with pre-removal hearing requirement when child is in "imminent danger"); W.Va.Code § 49–5–8 (1997) (Supp.1997) (permitting a law enforcement official to take a child into custody under emergency circumstances where the child is in "imminent danger"); W.Va. Code § 49–6–3 (1996) (Repl.Vol.1996) (permitting award of temporary custody where child is in "imminent danger," and there exist no reasonable alternatives to removing child from his/her home). For the same reasons, we cannot adopt the *Ss'* argument that the *Bs'* intention to relin-

quish their parental rights amounts to mental and emotional injury of the children because such relinquishment would, necessarily, result in the uprooting of the four children from the *S* household and their relocation to some unknown and unfamiliar new residence. Although the *Ss* cite numerous case authorities for this contention, we simply cannot agree that the abuse and neglect law of this State contemplates, either as abandonment or as abuse and neglect, a parent's voluntary relinquishment of his/her child for adoption.

24. Although the statutory waiting period, which requires a birth parent to wait seventy-two hours after the birth of his/her child before executing a relinquishment or consent, is not directly applicable to the instant facts, the holding of the circuit court in the proceedings below potentially affects this statutory requirement, as well. *See* W.Va.Code § 48–4–3a (1997) (Supp.1997). Were we to permit the circuit court's characterization of an intent to relinquish parental rights as grounds for abuse and neglect to persist, this construction could conceivably permit an abuse and neglect petition to be filed against a birth parent, contemplating adoption, before the statutory waiting period has expired.

six months immediately preceding the filing of the adoption petition.

W.Va.Code § 48-4-3c(a) (1997) (Supp.1997). Again, these criteria for abandonment do not comport with the fact pattern of the case presently before us. None of the elements of abandonment as recited above is present in the instant case. The *Bs* have not failed to financially support the children and, in fact, had arranged to pay the *Ss* for caring for the children during the initial period of respite care. Neither have the *Bs* failed to visit or otherwise communicate with their children for a period lasting six months. At the time the *Ss* filed the abuse and neglect petition, the *Bs* had attempted to retrieve their children from the *S* household, but their efforts were thwarted by the *Ss'* procurement of an *ex parte* order of temporary custody. Therefore, the circuit court's finding that the *Bs'* intention to relinquish their parental rights constituted abandonment is erroneous under the adoption statutes' definition of that term.

Finally, and perhaps most telling of the legislative intent underlying the statutory adoption laws of this State, is the fact that the Legislature amended virtually all of this State's pre-existing adoption law during its last legislative session. Despite these extensive amendments, though, the Legislature declined to characterize either a relinquishment or a consent, or the contemplation thereof, as either abandonment or abuse and neglect. Given the sweeping changes, it seems that had the Legislature intended such a result, it could have, and would have, effectuated such a change in conjunction with the other adoption amendments. However, it did not. Therefore, we can glean a legislative intent to permit a parent to relinquish his/her parental rights without being subject to abuse and neglect charges on the basis of abandonment.

■ The peculiar facts and circumstances of the instant case suggest that the only remedy available to the *Bs* is the writ of prohibition which they today seek. They have no other adequate remedy. If we deny the writ and permit the underlying abuse and neglect proceedings to continue to a final resolution, the children would be in judicial limbo for months, possibly even years. Further aggravating this scenario is the fact that the *Bs* are not seeking reunification with these children. Although the vast majority of abuse and neglect proceedings contemplate a parental improvement period in the hopes that the conditions of abuse and neglect can be eradicated, such proceedings in the instant case would be futile as the *Bs* ultimately desire to regain custody of the children for the sole purpose of relinquishing their parental rights and re-placing them for adoption. Therefore, given the unique circumstances of this case, we find no other remedy to be adequate, and we deem prohibition to be necessary to provide the petitioners with the requested relief.

### III.

### CONCLUSION

In conclusion, we cannot emphasize enough the calamitous impact that the characterization of relinquishment of parental rights for adoption purposes as abandonment or as abuse and neglect would have upon the adoption law of this State. Were we to construe such a relinquishment, or, as in this case, an intent to effectuate a future relinquishment, as abandonment, we would inevitably be opening the floodgates for abuse and neglect petitions. No more would birth mothers and other parents unable to care for their children be permitted to consider adoption as an option for fear that even the mere thought of relinquishment would permit them to be charged with abuse and neglect. And, as noted above, the recent legislative amendments to this State's adoption law would be rendered virtually meaningless with the likely curtailment of adoptions altogether. Therefore, while we can applaud the *Bs'* initial decision to accept these children into their home and can accept their decision that they can no longer care for these children, we simply cannot, in good conscience, find that their respect for the best interests of these children, which, of necessity, includes the relinquishment of their parental rights, constitutes either abandonment or abuse and neglect.

Thus, for the foregoing reasons, we find that the circuit court erred in concluding that the petitioners' intent to relinquish their pa-

rental rights constituted abandonment. Accordingly, we grant as moulded the petition for writ of prohibition and direct the circuit court to re-vest custody of the children in the petitioners.[25] We further instruct the petitioners and the DHHR to immediately complete preparations and to implement such final arrangements as are necessary for the prompt relinquishment and adoptive replacement of the children through the Gladney Center in order that these children may finally have a permanent adoptive home in the United States.[26]

Writ granted as moulded.

---

**25.** We commend the guardian *ad litem* for her appearance in this action and appreciate her efforts on behalf of the children involved in this case. Nonetheless, we are unable to abide by her suggestion that the best interests of the children demand their continued placement with the *Ss*. Not only are we troubled by the numerous allegations of abuse and neglect against the *Ss*, and the guardian's failure to address these charges in her recommendation, but we also are wary of the legal precedent that may result from such a holding in this case.

**26.** The speedy resolution of this matter in terms of the petitioners' relinquishment of their parental rights and the children's prompt re-placement is imperative as we typically attempt to resolve quickly those matters involving abuse and neglect and child custody. *See, e.g.,* W.Va.Code § 49–6–2(d) (1996) (Repl.Vol.1996) (encouraging prompt resolution of child abuse and neglect proceedings); *Carter v. Carter,* 196 W.Va. at 245 n. 7, 246, 470 S.E.2d at 199 n. 7, 200 (admonishing that child custody matters should be resolved "in a timely fashion in order to minimize the trauma to innocent children"); *West Virginia Dep't of Health & Human Resources ex rel. Wright v. David L.,* 192 W.Va. 663, 671, 453 S.E.2d 646, 654 (1994) (ordering expedited resolution of child custody issue); Syl. pts. 1 and 5, *In the Interest of Carlita B.,* 185 W.Va. 613, 408 S.E.2d 365 (1991) (emphasizing priority of child abuse and neglect cases to safeguard the interested child's well-being).