394 S.E.2d 515

**In the Interest of BRANDON L.E.**

**No. 19429.**

Supreme Court of Appeals of
West Virginia.

April 18, 1990.

Michael T. Clifford, Charleston, W.Va., for Brandon L.E.

Sandra Bullman, Charleston, W.Va., for father, Randy E.

WORKMAN, Justice:

This case involves application of the Uniform Child Custody Jurisdiction Act (UCCJA or Act). After assuming jurisdiction on a petition for a writ of habeas corpus, the Kanawha County Circuit Court subsequently decided that it did not have jurisdiction of this child custody matter under the UCCJA. Having examined the record of this case in conjunction with the UCCJA, this Court is of the opinion that the circuit court erred in declining jurisdiction of this child custody dispute.

The child at issue in this case, Brandon L.E., was born in Houston, Texas, on July 28, 1982. Brandon's mother and father, Randy E., separated in September 1983.[1] The record in this case does not set forth the amount of contact, if any, that Randy E. had with his son after the separation. It does reflect, however, that Brandon's father had virtually no contact with Brandon after 1985 until the State of Florida contacted him in connection with a dependency proceeding[2] which was initiated by the

---

1. Mr. E. obtained a divorce from Brandon's mother on April 11, 1988, in the state of North Carolina. The final order of divorce made no ruling as to custody, child support, or visitation with respect to Brandon.

2. A Florida dependency proceeding is analogous to an abuse and neglect proceeding in West Virginia. *See generally* Fla.Stat.Ann. §§ 39-.001-.14 (West 1974). Florida law defines a "dependent child" as a minor who:

 (a) Has been abandoned by his parents or other custodians.
 (b) For any reason, is destitute or homeless.
 (c) Has not proper parental support, maintenance, care or guardianship.

 (d) Because of the neglect of his parents or other custodians, is deprived of education as required by law, or of medical, psychiatric, psychological, or other care necessary for his well-being.
 (e) Is living in a condition or environment such as to injure him or endanger his welfare.
 (f) Is living in a home which, by reason of the neglect, cruelty, depravity, or other adverse condition of a parent or other person in whose care the child may be, is an unfit place for him.
 (g) Is surrendered to the division of family services or a licensed child-placing agency for purpose of adoption.
 *Id.* at § 39.01(10).

Florida Health and Rehabilitative Services (HRS) in the Circuit Court of the Fourth Judicial Circuit in Duval County, Florida.

At the outset of the dependency proceeding, the Florida state court placed Brandon in the temporary care, custody and control of Ann B., his maternal grandmother and the petitioner in this case. The Florida HRS initiated the dependency proceeding following the involuntary commitment of Brandon's mother on September 15, 1987, based on a diagnosis of Munchauser's syndrome by proxy. This syndrome is a malignant parental disorder which manifests itself as a form of child abuse. Afflicted parents relate fictitious histories, symptoms, and illnesses to treating physicians or attempt to administer medical treatment themselves. Of those individuals diagnosed with Munchauser's syndrome by proxy, it has been recognized that the parent, almost always the mother, typically has a nursing background or other work experience in a health-care setting. Brandon's mother, a former nurse, treated him for alleged diabetic seizures for over two years by administering insulin injections, when in fact Brandon was not diabetic. She also falsely reported that he suffered from a seizure disorder and medicated him with phenobarbital.

Ann B. moved to West Virginia with Brandon on May 27, 1988. Because Mrs. B. failed to obtain the court's consent to take Brandon out of state, the Florida court held an emergency hearing on May 31, 1988, and granted physical custody to the Florida HRS. After receiving a teletype from the Florida HRS, the Kanawha County Sheriff removed Brandon from Mrs. B.'s physical custody on June 1, 1988. On June 2, 1988, a Kanawha County Circuit Court Judge stayed the transfer directives and ordered physical custody returned to Mrs. B. pending further proceedings in

Florida already scheduled for June 23, 1988.

Brandon and his grandmother appeared for the June 23, 1988 hearing before the Florida court. At this hearing, the Florida HRS opined that "Randy [E.] has acknowledge[d] intent to seek custody of Brandon but he has not demonstrated the effort or interest shown by [the natural mother]" and "[i]t would be preferable for Brandon to remain in the care of his grandmother." The court went along with the opinion of the Florida HRS and continued custody with Mrs. B.

Prompted by the plan submitted to the Florida court by the HRS, Mr. E. attempted to become familiarized with Brandon in August 1988. Although the plan as originally formulated contemplated that Brandon and his father would have a one week period to get acquainted in Florida, Mr. E. chose to be in town for only two and one-half days for this purpose. From the limited record on this issue, it appears that Randy E. only visited with his son on two separate brief occasions within this time period.

Based on the fact that Brandon's mother had stipulated to "neglect," the Florida court ruled on September 29, 1988 that custody of Brandon would be transferred to his father absent a showing of abuse, neglect, or abandonment on his part.[3] A hearing was held on December 19, 1988, in connection with an amended petition of dependency filed against Mr. E. by Brandon's guardian *ad litem* which alleged, *inter alia*, abandonment. Remarkably, the court ruled that Mr. E. had not abandoned Brandon despite the fact that the father had failed to visit, financially support, or communicate with Brandon in any way for a number of years. On December 21, 1988, the Florida court awarded physical and legal custody of Brandon to Randy E.[4] Mrs.

---

**3.** The record before this Court does not reveal whether the Florida court held any hearings after the June 23, 1988 hearing which Mrs. B. and Brandon attended. The record is also devoid of the reasoning underlying the Florida court's announcement of its intention to award custody of Brandon to Mr. E.

**4.** Before awarding custody to Mr. E., the Florida circuit court recognized that it was presented with several questions of first impression. One of these questions concerned whether a child could be a "dependent child" under the statute (Fla.Stat.Ann. 39.01(10)) if the child was dependent as to the mother (based on stipulation) but not dependent as to the non-custodial father. The court resolved this issue by declaring

B. was not present at this court proceeding because she had been advised by the Florida judge that she did not have to appear at the December 21, 1988 hearing and further that custody was not going to be resolved at this time.[5]

Because Mrs. B. refused to recognize the Florida custody decree, Mr. E. filed a petition for a writ of habeas corpus in the Kanawha County Circuit Court seeking physical custody of Brandon on January 24, 1989. The circuit court, Judge Patrick Casey, granted immediate custody to Mr. E. On this same date, a petition for a writ of habeas corpus filed by Ann B. was assigned to Judge Kaufman. Mrs. B. and her counsel as well as Judge Kaufman were unaware of the writ filed by Mr. E. During a hearing held on January 25, 1989, Judge Kaufman was advised that the Florida order granting custody to Mr. E. was being appealed. Not wanting to disrupt Brandon's school year and recognizing that the Florida appeal could be resolved by the end of the school term, Judge Kaufman ordered that Brandon remain in Mrs. B.'s custody until a hearing could be scheduled after the school year ended.

A hearing was scheduled for May 9, 1989 before Judge Kaufman, but Mr. E. failed to appear. He claims that his attorney failed to provide him with notice of the hearing. When this matter next came before Judge Kaufman on October 23, 1989, the Florida circuit court's award of custody to Mr. E. had been upheld on appeal. At this hearing, Judge Kaufman, despite his previous exercise of jurisdiction, ruled that the Kanawha County Circuit Court did not have jurisdiction under the UCCJA to re-open the issue of Brandon's custody.

Following the October 23, 1989 hearing where Judge Kaufman declined jurisdic-

tion, Brandon lived with his father in Greenville, North Carolina, until December 14, 1989. On that date, Mrs. B., based on a stay of execution which was entered by the West Virginia Supreme Court on December 5, 1989 and clarified on December 13, 1989, obtained a court order from a North Carolina state court authorizing her to take Brandon to West Virginia. In the clarifying order, this Court reinstated the order of the Circuit Court of Kanawha County entered on February 1, 1989, which directed that Mrs. B. should retain temporary custody of Brandon pending further hearings and awarded monthly visitation rights to Mr. E. to take place in West Virginia. The North Carolina court rescinded its order of December 14, 1989 on December 15, 1989, but the rescission was of no consequence as Brandon had already been removed from North Carolina to West Virginia.

This case presents us with classic UCCJA application issues. Florida enters a child custody decree in December 1988. Child no longer resides in Florida at this time, having moved in May 1988 to West Virginia with his grandmother. Mother, although living in Florida, because of her involuntary commitment and consent to termination of her parental rights, is no longer a contestant with respect to custody. Father lives in North Carolina and has not seen child or expressed an interest in child for years. Based on this abbreviated factual scenario, we are asked to decide whether a West Virginia circuit court has jurisdiction under the UCCJA to hear this case given the entry of a prior custody decree by our sister state, Florida. We believe that the UCCJA unquestionably grants West Virginia jurisdiction to hear Mrs. B.'s petition and to modify the Florida

that Brandon could not be a "dependent child" absent a finding of neglect, abuse, or abandonment as to the non-custodial father.

5. One argument advanced by Mrs. B. is that the Florida custody decree violates the Act's explicit requirement of reasonable notice and opportunity to be heard. *See* Fla.Stat.Ann. § 61.131 (West 1985); W.Va.Code § 48–10–4 (1986). She maintains that because she was expressly advised by letter from the Florida judge that she did not need to appear at the December 21, 1988

hearing and even more importantly that custody of Brandon would not be resolved at such hearing, that the custody decree is without binding effect as it violates her rights of notice and opportunity to be heard under the Act. We do not address whether the "notice and opportunity to be heard" provision of the UCCJA was violated as the only issue before this Court is whether the West Virginia Circuit Court had jurisdiction to hear this matter.

court's decision if it deems modification in Brandon's best interest.

 The UCCJA "is premised on the theory that the best interests of the child are served by limiting modification of custody orders to courts having access to the maximum amount of information regarding the child." *Moran, The Uniform Child Custody Jurisdiction Act: An Analysis of Its History, A Prediction of Its Future,* 84 W.Va.L.Rev. 135, 146 (1981). One of the drafters of the UCCJA schematized the goals of the Act as follows:

'The basic scheme of the Act is simple. First, one court in the country assumes full responsibility for the custody of a particular child. Second, for this purpose, a court is selected which has access to as much relevant information about the child and family in the state as possible. Third, other essential evidence, which is inevitably out-of-state in the case of an interstate child, is channelled into the first court which might be called the 'custody court.' Fourth, other states abide by the decision of the custody court and enforce it in their territory, if necessary. Fifth, adjustments in visitation and other ancillary provisions of the decree, and custody changes, if any, are as a rule, made by the original custody court. Sixth, *if the child and his family no longer have appreciable ties with the state of the original court, a new custody court is selected to take the place of the original one for purposes of adjustments and modifications, and pertinent information is channelled from the prior to the subsequent custody court.'*

*Id.* at 146–47 (quoting Bodenheimer, *The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws,* 22 Vand. L.Rev. 1207, 1218 (1969) (emphasis supplied).

Numerous provisions within the UCCJA indicate that the Act's drafters fully expected and intended custody decrees to be subject to modification. *See* W.Va.Code §§ 48–10–3(a), –7(a), –8(b), –13 to –15 (1986). Ideally, Florida as the original cus-

tody court would be the court to address modification of its decree. *See Moran,* 84 W.Va.L.Rev. at 146–47. However, as the drafters of the UCCJA fully recognized, courts other than the original "custody courts" have jurisdiction to modify a custody decree. *See* W.Va.Code § 48–10–15 (1986). As the Act clearly contemplates, the mobility of today's society necessitates that courts other than the original "custody court" must be vested with jurisdiction to modify custody decrees. *See* UNIF. CHILD CUSTODY JURISDICTION ACT § 14 comment, 9, pt. 1, U.L.A. 292 (1968).

The father's sole argument in this case is that West Virginia's adoption of the UCCJA binds and ties this state's hands with respect to custody decrees entered by sister states. Mr. E. cites W.Va.Code § 48–10–14 to support his contention that West Virginia must give full faith and credit to the Florida custody decree. This section of the Act provides that:

The courts of this State shall recognize and enforce an initial or modification decree of a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with this article or which was made under factual circumstances meeting the jurisdictional standards of this article, so long as this decree has not been modified in accordance with jurisdictional standards substantially similar to those of this article.

W.Va.Code § 48–10–14. While this provision of the UCCJA does require *recognition* of out-of-state custody decrees, it also refers repeatedly to modified custody decrees.

 By focusing, to the exclusion of the Act's other provisions, on W.Va.Code § 48–10–14, Mr. E. fails to appreciate the legislative scheme anticipated by the Act's drafters. Notwithstanding their intent to require states adopting the UCCJA to recognize custody decrees entered by sister states, the Act's drafters in no uncertain terms provided jurisdiction to both the original "custody court" and other courts to consider modification of the initial custody decree. Under the UCCJA a second "cus-

tody court" has jurisdiction to modify another state's custody decree if:

(1) it appears to the court of this State that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this article or has declined to assume jurisdiction to modify the decree and (2) the court of this State has jurisdiction.

W.Va.Code § 48–10–15(a).

▮ To determine whether West Virginia, as opposed to Florida, has jurisdiction over this matter, we must examine the prerequisites required to invoke jurisdiction under the Act. A court can make a child custody determination by initial or modification decree if:

(1) This State (i) is the home state of the child at the time of commencement of the proceeding or (ii) has been the child's home state within six months before commencement of the proceeding, the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons and a parent or person acting as parent continues to live in this State; or

(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training and personal relationships; or

(3) The child is physically present in this State, and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because

he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

(4) (i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with subdivision (1), (2) or (3) of this subsection, or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction....

W.Va.Code § 48–10–3.

At the outset of this examination we note that the UCCJA adopted by Florida has jurisdictional prerequisites identical to those set forth in W.Va.Code § 48–10–3. *See* Fla.Stat.Ann. § 61.1308 (West 1985). While we do not question that Florida had jurisdiction when it entered the custody decree in December 1988,[6] Florida would not have jurisdiction over the issue of Brandon's custody today. We base this conclusion on the fact that the overriding concern of the UCCJA is to grant jurisdiction only to those courts which have "substantial evidence concerning the child's present or future care, protection, training and personal relationships." W.Va.Code § 48–10–3(a)(2)(ii).

With the exception of a one and one-half month period in late 1989, Brandon has lived in West Virginia since May 27, 1988. The Act is premised on an assumption that significant data regarding a child can be generated following a six-month period at a new residence. *See Moran, supra,* 84 W.Va.L.Rev. at 149. In selecting the six month period as the amount of time necessary to establish a state as the home state

---

**6.** At the time when the dependency proceedings were initiated in October 1987, Brandon was residing in Florida and had been residing there for some time. Accordingly, Florida, as the home state of Brandon, had access to vital information concerning his present and future welfare. While we recognize that when the custody decree was entered in December 1988 Brandon had moved to West Virginia, nonetheless Florida was in a better position than West Virginia at that time to adjudge custody given the ongoing inquiry into a custodial arrangement for Brandon which included the reports of the Flor-

ida HRS, a court-appointed psychologist, and a guardian *ad litem*. While this information may still be relevant to the current issue of what custodial arrangement is in the best interest of Brandon, information on his welfare and development since moving to West Virginia is of far greater significance and relevance. *See In re Marriage of Slate,* 181 Ill.App.3d 110, 129 Ill. Dec. 844, 536 N.E.2d 894 (1989) (holding that forum with "superior access to relevant information" on children is the appropriate court to exercise jurisdiction under the UCCJA).

of the child, the UCCJA drafters relied upon a study which demonstrated that a child is typically integrated into a new community within a six-month period. *See id.* at 148–49 (quoting Ratner, *Child Custody in a Federal System,* 52 Mich.L.Rev. 795, 815, 818 (1964)). Pursuant to this presumption, Brandon has been fully integrated into his West Virginia community and therefore West Virginia, as opposed to Florida, is the court system with access to the most current and critical evidence concerning Brandon's "present [and] future care, protection, training and personal relationships." W.Va.Code § 48–10–3(a)(2)(ii). Since Brandon is enrolled in elementary school in Kanawha County, West Virginia, school personnel can provide contemporaneous information regarding how well he is doing both academically and socially. Furthermore, because Brandon has been examined by a local psychiatrist on several occasions, there is additional evidence available in West Virginia regarding Brandon's current social and psychological development.

■ Section three of the UCCJA sets forth the prerequisites required to invoke jurisdiction under the Act. *See* W.Va.Code § 48–10–3(a). While a state has met the jurisdictional prerequisites of the UCCJA if it qualifies under any *one* of the subdivisions of W.Va.Code § 48–10–3(a), in this case West Virginia satisfies three of the possible four ways of establishing jurisdiction under the Act. Jurisdiction exists because West Virginia qualifies as the "home state" of Brandon by virtue of his residence in West Virginia six months prior to the commencement of the habeas corpus petition filed by Mrs. B. in January 1989.[7] *See* W.Va.Code § 48–10–3(a)(1). Jurisdiction is also established because both Brandon and his grandmother have significant connections with West Virginia as it is now their home state, and it is arguably within

the best interest of Brandon that a West Virginia court assume jurisdiction under the Act based on the availability of evidence concerning Brandon's present and future welfare within this State. *See* W.Va.Code § 48–10–3(a)(2). Based on our opinion that Florida does not have jurisdiction because it is no longer the home state of Brandon or any of the contestants in the custody dispute and because it does not have current data concerning Brandon's present or future welfare, we conclude that the best interests of Brandon require West Virginia to assume jurisdiction of a modification petition given his connections to this state. *See* W.Va.Code § 48–10–3(a)(4). Having established that West Virginia does have jurisdiction under the UCCJA, a West Virginia circuit court has authority to modify the Florida court's custody decree. *See* W.Va.Code § 48–10–15(a).

■ The right to modify a foreign custody decree has been recognized by numerous courts. *See Kudler v. Smith,* 643 P.2d 783 (Colo.App.1981), *cert. denied,* 459 U.S. 837, 103 S.Ct. 83, 74 L.Ed.2d 78 (1982) (Colorado, as the "home state," had jurisdiction to modify New York custody decree where denial of maternal grandparents' visitation rights deemed in best interests of children); *Gordey v. Graves,* 528 So.2d 1319 (Fla.App.1988) (Florida court should have assumed jurisdiction to consider grandparents' petition to modify custody provisions of Nevada divorce decree where Florida was child's "home state" and child's only "significant connection" with Nevada was residence of natural mother whom child had not seen in over four years); *Jennings v. Jennings,* 392 So.2d 962 (Fla.App.1980) (Florida court abused its discretion in refusing to exercise jurisdiction to consider father's amended complaint to modify child custody provisions of Idaho

---

7. In recognizing West Virginia as Brandon's "home state," we are not suggesting that "home state" status can be established merely by taking a child to a state and residing there for six months as a means of acquiring jurisdiction to modify a foreign custody decree. *See Sams v. Boston,* 181 W.Va. 706, 384 S.E.2d 151 (1989) (holding that a state remains the "home state" for purposes of the UCCJA and the Parental

Kidnapping Prevention Act for reasonable period of time where children abducted and concealed in another state). Since Mrs. B. did obtain the Florida court's approval of her continued custody of Brandon within less than a month of her move to West Virginia, we do not view the move to West Virginia as one calculated for the purpose of deceptively invoking UCCJA jurisdiction in a second state.

divorce decree where complaint contained sufficient allegations of changed circumstances); *Gordon v. Gordon,* 185 Ga.App. 100, 363 S.E.2d 353 (1987) (providing jurisdictional requisites of UCCJA were satisfied and there was material change in conditions affecting child's welfare since entry of prior decree, Georgia court had jurisdiction to modify Ohio change of custody decree).

Under facts comparably analogous to those in this case, it was determined that Michigan had jurisdiction under the UCCJA to entertain the paternal grandfather's petition for modification of child custody despite the continued presence of both parents in California, the decretal state which granted alternating annual custody to the parents. *See In re Danke,* 169 Mich.App. 453, 426 N.W.2d 740 (1988). Recognizing that Michigan had become the "home state" of the child given his residence with the grandfather for more than 17 months prior to commencement of the modification petition, the court reversed and remanded the circuit court's order which found jurisdiction lacking under the UCCJA. 426 N.W.2d at 742–43. Like this Court, the *Danke* court focused on the child's significant connection with the "home state" in concluding that a Michigan "court would have optimum access to the relevant evidence concerning the child in this case and his family." 426 N.W.2d at 743. The *Danke* court remanded the case for a full evidentiary hearing with the following instructions:

> On remand, the circuit court shall determine, first, whether an established custodial environment exists, ... and, second, whether a change in custody is in the best interests of the child.... If an established custodial environment exists, it must be shown by clear and convincing evidence that a change in custody would

be in the best interests of the child. If an established custodial environment does not exist, it must be shown by a mere preponderance of the evidence that a change in custody would be in the best interests of the child.

*Id.* (citations omitted).

Brandon's father need not fear that the modification proceeding will turn into a *de novo* custody determination. The Act requires that West Virginia as a modifying court "shall give due consideration to the transcript of the record and other documents of all previous proceedings submitted to it in accordance with section twenty-two [§ 48–10–22] of this article." W.Va.Code § 48–10–15(b). Section twenty-two of the Act requires a Florida court to forward to the Kanawha County Circuit Court a certified copy of all documents pertaining to the custody determination upon appropriate request. W.Va.Code § 48–10–22 (1986). From our examination of the record in this case, it appears that the Kanawha County Circuit Court already has copies of numerous documents pertaining to the Florida proceedings. Accordingly, Mr. E. should not be concerned that the West Virginia court will not give appropriate consideration to the information and findings set forth in the documents pertaining to the Florida proceedings.

Given Judge Kaufman's prior exercise of jurisdiction in this case and his consequent familiarity with the factual and legal background of this matter, we remand this case to his court to determine whether the best interests of Brandon require that the maternal grandmother as opposed to the father retain custody of Brandon. Appropriate factors for the court to consider on this issue include the father's record with respect to payment of child support[8] and visitation,[9] together with any other indicia

---

**8.** Mr. E. was ordered by the Florida court to pay child support in the sum of thirty dollars weekly beginning on December 18, 1987. To date, he has paid a total of approximately $300.00 in court-ordered child support.

**9.** Based on the total absence of a parental/child relationship, the Florida HRS opposed any visitation between Brandon and his father at the

December 1987 hearing. When the Florida court did approve a refamiliarization plan that was to occur over a one week period, Mr. E. chose to limit the refamiliarization to a 72 hour period during which he visited with Brandon on two separate brief occasions in August 1988. Following this "visitation," Mr. E. failed to exercise his visitation rights further. Brandon did not see his father again until October 23, 1989,

of normal parental interest (e.g. letters, gifts, telephone calls, and other communications). In addition, the court should give appropriate consideration to psychological evidence which is admissible pursuant to W.Va.Code § 48–10–12 (1986).

■ This Court's decision in *Lemley v. Barr*, 176 W.Va. 378, 343 S.E.2d 101 (1986) may prove instructional to the circuit court when considering this case on remand. In *Lemley*, we determined that notwithstanding an invalid adoption, the determination of "what physical custody arrangement" was in the child's best interest was required by the fact that the five-year-old child had spent almost his entire life with an adoptive mother. *Id.* 176 W.Va. at 386, 343 S.E.2d at 109. In that case, we recognized that the equitable rights of the child could be placed above the legal rights of his mother and noted:

> The day is long past in this State, if it had ever been, when the right of a parent to the custody of his or her child, where the extraordinary circumstances are present, would be enforced inexorably, contrary to the best interest of the child, on the theory solely of an absolute legal right. Instead, in the extraordinary circumstance, when there is a conflict, the best interest of the child has always been regarded as superior to the right of parental custody. Indeed, analysis of the cases reveals a shifting of emphasis rather than a remaking of substance. This shifting reflects more the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest. A child has rights too, some of which are of a constitutional magnitude.

*Id.* (quoting *Bennett v. Jeffreys*, 40 N.Y.2d 543, 546, 387 N.Y.S.2d 821, 824, 356 N.E.2d 277, 281 (1976) (citations omitted)).

■ We further acknowledged in *Lemley* that in cases where a child has been in one home for a substantial period, "[h]is environment and sense of security should not be disturbed without a clear showing of significant benefit to him." 176 W.Va. at 386, 343 S.E.2d at 110 (quoting *In Revocation of Appointment of a Guardian*, 360 Mass. 81, 85, 271 N.E.2d 621, 624 (1971); *see also In re Danke*, 169 Mich.App. 453, 426 N.W.2d 740 (1988) (holding that where established custodial environment exists, clear and convincing evidence demonstrating custody change in child's best interest required to modify foreign custody decree). In Brandon's case, he has lived with or been taken care of by his maternal grandmother for the majority of his young life and almost exclusively since September 1987.[10] If a child has resided with an individual other than a parent for a significant period of time such that the non-parent with whom the child resides serves as the child's psychological parent, during a period when the natural parent had the right to maintain continuing substantial contact with the child and failed to do so, the equitable rights of the child must be considered in connection with any decision that would alter the child's custody. To protect the equitable rights of a child in this situation, the child's environment should not be disturbed without a clear showing of significant benefit to him, notwithstanding the parent's assertion of a legal right to the child.

A review of the record in this case suggests that Brandon is in much the same position as the child in *Lemley*. In both cases, a claimed right of parental custody may be in conflict with the best interests of the child. As we set forth in *Lemley*, "The law does not recognize any absolute right in any person or claimant to the custody of

---

when he went to live with Randy E. in North Carolina. Notwithstanding Judge Kaufman's order of January 25, 1989, which permitted him to visit Brandon once a month in West Virginia, no such visitation ever occurred.

10. Mrs. B. and Brandon's mother have lived close to each other for most of Brandon's life. With the exception of the first nine months of his life and six or seven months when he lived

with his mother in Houston, Brandon either lived with or was taken care of by Mrs. B. From September 1987, when Brandon's mother was involuntarily committed, Brandon has lived continuously with his maternal grandmother with the exception of a one and one-half month period in late 1989 when he resided with his father in North Carolina.

a child." *Id.* at Syl. Pt. 6, in part. In Brandon's case, he has spent so much time with his grandmother that she is recognized by a treating psychiatrist as the "psychological" parent. In determining what the best interests of Brandon require with regard to immediate custodial arrangements, the question of whether the father has abdicated his parental rights and responsibilities must also be examined.

Based upon the foregoing, the judgment of the Circuit Court of Kanawha County is reversed and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.