507 S.E.2d 698

WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES ex rel. Sharron HISMAN, Social Service Worker, Appellee,

v.

ANGELA D., Zachary D., Kristopher D., and the unknown putative fathers of Zachary D. and Kristopher D., Respondents Below,

David W., Appellant.

No. 24670.

Supreme Court of Appeals of West Virginia.

Submitted May 13, 1998.

Decided July 15, 1998.

---

Margaret Phipps Brown, Esq., Assistant Prosecuting Attorney, Huntington, West Virginia, Darrell V. McGraw, Jr., Attorney General, Teresa Brown, Esq., Assistant Attorney General, Charleston, West Virginia, Attorneys for Appellee.

Alvie E. Quails, III, Esq., Public Defender, Huntington, West Virginia, Attorney for Angela D.

David R. Dillon, Esq., Bailes, Craig & Yon, Huntington, West Virginia, Attorney for David W.

Lisa Fredeking White, Huntington, West Virginia, Guardian ad Litem.

PER CURIAM: [1]

Mr. David W.[2] (hereinafter "Appellant") appeals the exercise of jurisdiction by the Circuit Court of Cabell County over Zachary D. in an abuse and neglect proceeding initiated in Cabell County, West Virginia. The Appellant contends that Lawrence County, Ohio, is the proper jurisdiction and that Ohio is the home state of the child pursuant to the Uniform Child Custody Jurisdiction Act (hereinafter "UCCJA"). We disagree with the Appellant's contentions and affirm the determination of the lower court that West Virginia properly maintained jurisdiction in this matter.

## I. Facts

Zachary D. was born on January 27, 1991. His mother, Angela D., was fifteen years old at the time of Zachary's birth, and Angela's mother, Barbara D.,[3] maintained temporary custody of Zachary prior to Angela's eighteenth birthday in July 1993.[4] Neither the putative father nor his family has ever had contact with Zachary. In November 1993, May 1994, and an additional six instances in 1995, the Cabell County Department of Health and Human Resources (hereinafter "DHHR") received referrals regarding Angela, Barbara, and Zachary, generally alleging that Angela was improperly caring for Zachary and had left him with various other individuals without providing for his care or well-being. The DHHR allegedly attempted to locate Angela subsequent to these referrals, but was unsuccessful.

On March 7, 1994, Kristopher D. was born to Angela. According to the record, Kristopher resided with Ms. Kathy Merritt, a family friend in Huntington, West Virginia, on the weekends for the first three months of his life and began residing exclusively with Ms. Merritt in June 1994. Ms. Merritt did not receive monetary compensation for this care of Kristopher. Zachary also allegedly spent considerable time with Ms. Merritt in Huntington, West Virginia, in 1994, and both Kristopher and Zachary resided with Ms. Merritt in June and July 1995.

Angela received AFDC support for Zachary during August and September 1995, and he was allegedly living primarily in her household in West Virginia during those months.[5] During portions of 1995, Zachary apparently stayed with Barbara and the Appellant in Ohio and was enrolled in Kindergarten in South Point, Ohio, near the Appellant's residence.

On November 20, 1995, the Appellant filed a petition in Ohio seeking custody of Zachary and claiming that Zachary had been living with him in Ohio for over a year. On December 21, 1995, pursuant to the Appellant's request for custody, Angela signed an Ohio consent form to permit the Appellant to adopt Zachary.[6] On December 26, 1995, the Ohio court issued an order placing Zachary

1. We point out that a per curiam opinion is not legal precedent. See *Lieving v. Hadley*, 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4 (1992).

2. We follow our past practice in domestic and juvenile cases involving sensitive facts and do not use the last names of the parties. See, e.g., *State ex rel. Amy M. v. Kaufman*, 196 W.Va. 251, 254 n. 1, 470 S.E.2d 205, 208 n. 1 (1996).

3. Barbara D. has a history of mental illness and had her own children removed from her custody. Although Barbara maintained an apartment in Huntington, West Virginia, she has also lived intermittently with the Appellant at his home in South Point, Ohio.

4. Zachary apparently resided at the Appellant's home in South Point, Ohio, with Barbara and the Appellant during portions of 1992 and 1993, Barbara received AFDC assistance for Zachary, and Angela kept Zachary during the day while the Appellant worked. According to the record, Angela was living at various locations in Cabell County, West Virginia, during this time.

5. In August 1995, Angela left Kristopher, then seventeen months old, with Ms. Kisha White who allegedly attempted to sell Kristopher for cocaine. The record is unclear as to the location of the residence of Kisha White. In October 1995, Kristopher once again began living exclusively with Ms. Merritt and her family in Huntington, West Virginia.

6. Pursuant to West Virginia Code § 49–6–5(a)(6) (1996), a parent against whom abuse and neglect proceedings have been filed may not confer any rights on a third party by executing a consent to adopt during the pendency of the proceeding. See *Alonzo v. Jacqueline F.*, 191 W.Va. 248, 445 S.E.2d 189 (1994). In the present case, however, Angela signed the adoption consent prior to the filing of the petition of abuse and neglect.

with the Appellant in anticipation of potential future adoption. This Ohio order found that Zachary was a resident of Ohio.[7]

On February 16, 1996, the DHHR in Cabell County, West Virginia, filed an abuse and neglect petition alleging that Zachary, then age five, and Kristopher, then almost two years of age, were neglected children.[8] The whereabouts of Zachary were unknown to DHHR, although the petition stated that DHHR believed that Zachary was living with Barbara, the maternal grandmother.[9] In response to the DHHR petition, the lower court granted emergency custody of Zachary and Kristopher to the DHHR on February 16, 1996. Zachary had not yet been located, and Kristopher thereafter remained in the care of Ms. Merritt in Huntington, West Virginia.

Based upon Angela's failure to appear at hearings scheduled in Cabell County on February 19, 1996, and March 4, 1996,[10] custody of the children remained with the DHHR. On March 14, 1996, in an attempt to find Zachary, the DHHR located Barbara at her Huntington, West Virginia, home. According to the testimony of Ms. Sharron Hisman, a child protective services worker, Barbara informed Ms. Hisman that Zachary was visiting the Appellant in Ohio. Ms. Hisman asked Barbara to transport Zachary to the DHHR later that day. The DHHR thus obtained physical custody of Zachary when he was brought to the DHHR office on March 14, 1996.

From March 1996, both Zachary and Kristopher resided in the Merritt home in Huntington, West Virginia. On May 6, 1996, CASA[11] Shirley Lewis submitted a report detailing her visitation to the Merritt home. Ms. Lewis indicated that the children both related well to Ms. Merritt and her teenaged daughters. Ms. Lewis also reported that Ms. Merritt was interested in adopting both children. The May 6, 1996, report recommended termination of Angela's parental rights based upon her neglect of the children. That report also related Zachary's alleged statements concerning the Appellant and his living quarters in what Zachary described as a "dirty old bus." Ms. Lewis also noted that based upon the Appellant's failure to appear for two initially scheduled adoption hearings in Ohio, the adoption proceedings were dismissed on March 14, 1996, and the Appellant subsequently refiled for adoption. The Appellant's petition for adoption was reinstated on March 21, 1996, in Ohio. Ms. Lewis also observed that the Appellant and the maternal grandmother, Barbara, were not residing together at that time.

In May 1996, the Appellant filed a motion to dismiss the abuse and neglect proceedings in Cabell County based on alleged lack of jurisdiction in West Virginia. The lower court denied the motion but included the Appellant as a party to the abuse and neglect proceedings in West Virginia. Guardian ad litem Lisa White, appointed on behalf of Zachary, informed the lower court that pursuant to her discussions with the Ohio judge and guardian ad litem, it was her under-

---

7. The December 26, 1995, Ohio order provides as follows:

This cause came on to be heard on the Application of Angela [D.], the parent of Zachary [D.] for approval of the proposed placement of the child with David [W.] for adoption.

There appeared before the court Angela [D.], the parent of the child, who was examined by the Court, and there was submitted to the Court the report of the Lawrence County Department of Human Service, Children's Services Division, who was appointed to make an independent investigation of the proposed placement and the Court finds, after consideration of the testimony, report and the evidence submitted that the child is a resident of Lawrence County, Ohio and has determined that the placement would be in the best interests of the child.

8. The petition was based upon the referrals of November 1993, May 1994, and six referrals in 1995, alleging generally that Angela was improperly caring for Zachary and Kristopher and had left them with various individuals without properly providing for their care. Kristopher is not a subject of this appeal.

9. DHHR apparently had no knowledge of the adoption proceedings for Zachary in Ohio.

10. The record does not reveal whether Angela had been given proper notice of these hearings.

11. On April 16, 1996, the lower court had appointed a CASA (Court Appointed Special Advocate) for Zachary and Kristopher.

standing that adoption would not be recommended until a home study of the Appellant's home could be completed in Ohio.

In a June 13, 1996, report, Ms. Lewis recommended continued custody in the Merritt home, appointment of attorneys for the putative fathers so that termination of their parental rights could move forward, and denial of visitation to the Appellant.[12] In a June ·17, 1996, hearing, as part of the improvement period granted to Angela, the lower court approved the Merritt home for temporary foster care and granted Angela supervised visitation with the children. The Appellant was permitted two supervised visits, and River Valley Child Development Center was to provide counseling and developmental screenings on the boys. Counsel was also appointed for the putative fathers in anticipation of proceedings to terminate their parental rights.

On June 21, 1996, the lower court entered an order continuing legal and physical custody of the children with the DHHR, and indicating that Angela had admitted neglecting the children. The court further ordered that no family member, including Angela, Barbara, or the Appellant, should have contact with the caregiver for the children.

· On July 11, 1996, the Ohio court entered an order appointing the Appellant as Zachary's guardian, but that order has been suspended pending a decision by this Court in the present jurisdictional matter.[13] In an August 20, 1996, CASA report, Ms. Lewis recommended termination of Angela's rights, placement of both boys with Ms. Merritt, and visitation rights for the Appellant and Barbara. On September 30, 1996, the lower court granted Angela a ninety-day improvement period, terminated the parental rights of the unknown putative fathers, and denied the Appellant's motion for weekend visita-

tion, allowing him one supervised visit per month.

On December 6, 1996, Zachary's guardian ad litem moved for termination of Angela's improvement period based upon her failure to cooperate and her failure to attend counseling at Prestera Mental Health Center. Angela had also failed to appear for scheduled visitation with the children. The guardian emphasized the necessity for attention to be focused upon a permanency plan for the children.

In a December 13, 1996, CASA report, Ms. Lewis stated that Angela's improvement period had produced no positive results, that she was not in compliance with the treatment plan, and that she had failed to attend sessions at Prestera designed to address her substance abuse problems. Ms. Lewis again recommended termination of Angela's parental rights.

On January 6, 1997, Angela entered a drug rehabilitation program and departed the program without permission on January 15, 1997. DHHR has had no further contact with Angela since that time. Hearings in the lower court regarding the jurisdictional issue were held on February 6, 1997, and March 5, 1997. Although Ohio had taken jurisdiction pursuant to the Appellant's recitation of the facts concerning Zachary's living arrangements, the DHHR submitted evidence indicating that child protective service workers investigating referrals of suspected child neglect had been advised that Angela and the children were residents of Cabell County, West Virginia, and the allegations which formed the basis for the petition for neglect had occurred in West Virginia. The DHHR contended that the Appellant's allegations that he had maintained physical custody of Zachary for years preceding the initiation of the neglect petition were not consistent with the prior investigations by the DHHR or

---

12. With regard to the denial of the Appellant's motion for visitation, Ms. Lewis reasoned that the Appellant had never served as the primary caretaker for the boys and had "hidden Zachary from DHHR and other agencies in the past. He has no job to support the child."

13. In the July 11, 1996, order, the Ohio Court of Common Pleas, Probate Juvenile Court, found

"that at the time of the placement of the child that the Court had jurisdiction over the child...." The court further found that prior to the abuse and neglect petition in West Virginia, the Ohio court "had exercised jurisdiction over Zachary Davis and that this Court was the appropriate form (sic) to exercise the jurisdiction of said minor."

with reports by Kathy Merritt that Zachary had lived with Ms. Merritt for weeks or months at a time during the period immediately preceding the Appellant's initiation of custody proceedings in Ohio. At the conclusion of the jurisdictional hearings, the lower court explained as follows:

> I find that because of the vagabond helter-skelter life of the mother, that at the time the State of West Virginia exercised its jurisdiction through the filing of the petition in February [1996], that it cannot be concluded that the State of Ohio could be determined to have been exercising jurisdiction substantially in conformity with Article 48 of the code. For reasons through her transitory and vagabond life they could not have met the—the State of Ohio could not have met the residency requirement.

On March 27, 1997, the lower court found that Ohio did not have jurisdiction, and that West Virginia had properly maintained jurisdiction over Zachary.[14] The Appellant now appeals that order.

While this appeal was pending, continued reports of the CASA representatives have indicated that the children are thriving in the custody of Ms. Merritt and that Ms. Merritt has earned her BSN in nursing and her nurse's license. She is currently employed by Southwestern Community Action Council as an RN/Case Manager.

## II. Analysis

■ The Appellant raises three allegations of error: (1) DHHR failed to comply with the UCCJA in exercising jurisdiction over Zachary; (2) the lower court erred in failing to recognize and enforce the Ohio custody decree which placed Zachary with the Appellant in anticipation of adoption; and (3) DHHR improperly removed Zachary from the Appellant's custody in Ohio. In syllabus point one of *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995), we explained that "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a de novo standard of review."

■ Upon review of the record and briefs in this matter, we find that the DHHR properly asserted jurisdiction in February 1996 by filing a petition alleging the neglect of Zachary after receiving referrals alleging neglect of the child while residing in Cabell County, West Virginia. Zachary was thus brought within the jurisdiction of the lower court by virtue of the reports of neglect occurring in Cabell County, the county in which DHHR had evidence indicating that he, his mother, and his maternal grandmother resided.[15]

**14.** As we explained in footnote 18 of *Haller v. Haller*, 198 W.Va. 487, 481 S.E.2d 793 (1996):

> The UCCJA encourages discussion and collaboration between the judges in the courts which could potentially assume jurisdiction over the matter, as evidenced by its provisions regarding inconvenient forums and simultaneous proceedings in other states. West Virginia Code § 48–10–7(d) provides that a court, prior to determining whether to retain jurisdiction, "may communicate with a court of another state and exchange information pertinent to the assumption of jurisdiction by either court with a view to assuring that jurisdiction will be exercised by the more appropriate court and that a forum will be available to the parties." West Virginia Code § 48–10–6(c) specifies that if a court discovers, during the pendency of its own proceeding, the antecedent existence of a proceeding concerning custody in another state, "it shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum and that information be exchanged in accordance with sections nineteen, twenty, twenty-

one and twenty-two [§§ 48–10–19, 48–10–20, 48–10–21 and 48–10–22] of this article."

The extent to which such conversations were had in the present matter is unclear.

**15.** In *State ex rel. Paul B. v. Hill*, 201 W.Va. 248, 496 S.E.2d 198 (1997), we explained:

> While not explicitly stated in the abuse and neglect statutes, we previously have recognized that circuit courts have "original jurisdiction of all cases coming within the terms of the [child welfare] act," which serves to protect "delinquent, dependent and neglected children." *Locke v. County Court of Raleigh County*, 111 W.Va. 156, 158, 160, 161 S.E. 6, 7 (1931) (emphasis added).

201 W.Va. at 257, 496 S.E.2d at 207. West Virginia Code § 49–6–1(a), in pertinent part, provides:

> (a) If the state department or a reputable person believes that a child is neglected or abused, the department or the person may present a petition setting forth the facts to the circuit court in the county in which the child resides, or to the judge of such court in vaca-

### A. Applicability of the UCCJA and PKPA to Abuse and Neglect Proceedings

Once the lower court learned of the Ohio custody and adoption proceedings, the jurisdictional issue was raised and a determination of proper jurisdiction for this custody matter was necessitated. The UCCJA, West Virginia Code § 48–10–1, et seq. (1995), and the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A (1994), (hereinafter "PKPA") govern interstate child custody disputes. Within the definition of "custody proceeding," the UCCJA expressly includes abuse and neglect proceedings. West Virginia Code § 48–10–2(3) provides: "'Custody proceeding' includes proceedings in which a custody determination is one of several issues, such as an action for divorce or separation, and includes child neglect and dependency proceedings[.]" Thus, based upon the UCCJA's explicit inclusion of abuse and neglect proceedings within the definition, of custody proceedings, we address the UCCJA in the context of this abuse and neglect matter. Application of the UCCJA to juvenile neglect proceedings has also been recognized in other jurisdictions. *See, e.g., L.G. v. People,* 890 P.2d 647 (Colo.1995); *In Interest of L. C.,* 18 Kan.App.2d 627, 857 P.2d 1375 (Kan.App.2d 1993); *In re C. O.,* 856 P.2d 290 (Okl.Ct.App. 1993); *In re E.H.,* 612 N.E.2d 174 (Ind.Ct. App.1993).

The Fourth Circuit Court of Appeals recognized in *Meade v. Meade,* 812 F.2d 1473 (4th Cir.1987), that the PKPA was designed to remedy inconsistent UCCJA interpretations by various state courts and to create a uniform application of child custody jurisdictional standards. 812 F.2d at 1476. Addressing the applicability of the PKPA to abuse and neglect actions, the Court of Appeals of North Carolina explained as follows:

Although the PKPA does not include within its definition section any reference to neglect, abuse, or dependency proceedings, 28 U.S.C.A. S 1738A(b), "there is nothing to indicate that it was intended to be limited solely to custody disputes between parents." *In re Appeal in Pima County Juvenile Action No. J–78632,* 147 Ariz. 527, 711 P.2d 1200, 1206 (Ct.App. 1985), *approved in part, vacated in part,* 147 Ariz. 584, 712 P.2d 431 (1986). Furthermore, "[t]he PKPA's coverage of custody proceedings is exclusive [in providing that] 'every State shall enforce ... and shall not modify ... any child custody determination made ... by a court of another State.'" *State in Interest of D.S.K.,* 792 P.2d 118, 129 (Utah Ct.App.1990). Accordingly, "the PKPA is applicable to all interstate custody proceedings affecting a prior custody award by a different State, including [abuse,] neglect and dependency proceedings." See *id.* at 130[.]

*In re Van Kooten,* 126 N.C.App. 764, 769, 487 S.E.2d 160, 163.

### B. Analysis of UCCJA and PKPA

The PKPA requires every state to recognize and enforce custody determinations of sister states if such determinations were consistent with the Act, providing as follows at 28 U.S.C. § 1738A(a):

The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State.[16]

The UCCJA contains a similar arrangement, providing "that foreign states' custody decrees are to be recognized and enforced by West Virginia courts if they accord with statutory provisions substantially similar to those of the UCCJA or meet UC-

---

tion. The petition shall be verified by the oath of some credible person having knowledge of the facts. The petition shall allege specific conduct including time and place, how such conduct comes within the statutory definition of neglect or abuse with references thereto, any supportive services provided by the state department to remedy the alleged circumstances and the relief sought.

**16.** Subsection (f) of § 1738A provides:

A court of a State may modify a determination of the custody of the same child made by a court of another State, if—
(1) it has jurisdiction to make such a child custody determination; and
(2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.

CJA jurisdictional standards." *Arbogast v. Arbogast,* 174 W.Va. 498, 502, 327 S.E.2d 675, 679 (1984). In syllabus point two of *Arbogast,* we explained:

Under the Parental Kidnapping Prevention Act of 1980, 28 U.S.C. Sec. 1738A (1982), our courts are required to enforce an out-of-state child custody modification decree if: (1) the initial decree was consistent with the act; (2) the court in the first state had jurisdiction under its laws to modify the initial decree; and (3) a child or one of the contestants in such proceeding has remained a resident of the first state.

Syllabus point three of *Arbogast* emphasized that "[b]efore an out-of-state child custody decree can be enforced here, it must be demonstrated that the court making the decree had jurisdiction of the parties and of the subject matter of the dispute." In *Arbogast,* we acknowledged that both the PKPA and UCCJA [17] attempt "to eliminate judicial com-

17. The UCCJA provides that a court is authorized to assume jurisdiction over a child custody matter by initial or modification decree under section 48–10–3 of the UCCJA where certain requirements are satisfied:

(1) This State (i) is the home state [home state defined as the State in which, immediately preceding the initiation of proceeds, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months] of the child at the time of commencement of the proceeding or (ii) has been the child's home state within six months before commencement of the proceeding, the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons and a parent or person acting as parent continues to live in this State; or

(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training and personal relationships; or

(3) The child is physically present in this State, and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

(4)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with subdivision (1), (2) or (3) of this subsection, or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction. . . .

The applicable language of the PKPA, 28 U.S.C. § 1738A(c), (d), and (g), provides as follows:

(c) A child custody determination made by a court of a State is consistent with the provisions of this section only if—
(1) such court has jurisdiction under the law of such State; and
(2) one of the following conditions is met:

(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;
(B)(i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;
(C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse;
(D)(i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; or
(E) the court has continuing jurisdiction pursuant to subsection (d) of this section.
(d) The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.

\*　　\*　　\*　　\*　　\*　　\*

(g) A court of a State shall not exercise jurisdiction in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the

petition and conflicting decrees in interstate child custody dispute by establishing clear and definite rules about which state has jurisdiction of a custody dispute and enforcing orders of that state." *Id.*

■ In *Sheila L. v. Ronald P. M.*, 195 W.Va. 210, 465 S.E.2d 210 (1995), we recognized that the full faith and credit doctrine will not be applied where a foreign court lacked jurisdiction under the UCCJA and the PKPA. *Id.* at 217, 465 S.E.2d at 217. In syllabus point one of *Sheila L.*, we stated:

> "The Parental Kidnapping Prevention Act of 1980, 28 U.S.C. § 1738A (1982), extends full faith and credit principles to child custody decrees and requires every state to enforce sister state custody determinations that are consistent with the act." Syllabus Point 1, *Arbogast v. Arbogast*, 174 W.Va. 498, 327 S.E.2d 675 (1984).

In *Sheila L.*, the mother lived in West Virginia with the child, and the father resided in Ohio. 195 W.Va. at 213, 465 S.E.2d at 213. The father obtained an ex parte order from the Ohio Court of Common Pleas granting him temporary custody of the child based upon allegations that the mother's stepfather abused the child while the child resided with the mother in West Virginia. *Id.* Ohio then retained jurisdiction, and West Virginia accorded full faith and credit to the Ohio determination of custody to the father. *Id.* at 215, 465 S.E.2d at 215. The mother appealed, and this Court held that although Ohio properly maintained jurisdiction for the purpose of emergency custody under the allegations of abuse, Ohio lacked jurisdiction for determination of the ultimate custody resolution and West Virginia, as the home state, was deemed the most appropriate forum for deciding the custody issue. *Id.* at 223, 465 S.E.2d at 223.

■ As we observed in syllabus point one of *In re Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990):

> The Uniform Child Custody Jurisdiction Act, W.Va.Code §§ 48–10–1 to –26 (1986), is premised on the theory that the best interests of a child are served by limiting jurisdiction to modify a child custody decree to the court which has the maximum amount of evidence regarding the child's present and future welfare.

Syllabus point two of *Brandon* explained:

> Notwithstanding their intent to require states adopting the Uniform Child Custody Jurisdiction Act to recognize custody decrees entered by sister states, the Act's drafters in no uncertain terms provided jurisdiction to both the original 'custody court' and other courts to determine whether modification of the initial custody decree is in the best interest of the child.

■ In *Brandon*, we concluded that the best interests of the child dictated that West Virginia, the court with the most substantial evidence regarding the child's present and future well-being, should have jurisdiction. 183 W.Va. at 119, 394 S.E.2d at 521. Significantly, we explained in *Brandon* that the UCCJA permits a sister state with contacts to the child to determine whether modification of the initial decree is in the best interests of the child and requires that West Virginia, if serving as a modifying court, " 'give due consideration to the transcript of the record and other documents of all previous proceedings submitted to it in accordance with section twenty-two [Sec. 48–10–22] of this article.' W.Va.Code § 48–10–15(b)." 183 W.Va. at 120, 394 S.E.2d at 522. Under section twenty-two of the Act, a foreign court would be required to forward to the West Virginia court a certified copy of all documents pertaining to the custody determination upon appropriate request. W.Va.Code § 48–10–22 (1986).

We also found in *Brandon* that West Virginia had jurisdiction because of the "substantial evidence concerning the child's present or future care, protection, training and personal relationships." 183 W.Va. at 118, 394 S.E.2d at 520 (quoting W.Va.Code, 48–10–3(a)(2)(ii)). We found that Florida, the state making the initial determination, no longer had jurisdiction and recognized that the residence of a child within a community for six months can generate significant data. *Id.*

While a matter arising in the abuse and neglect arena obviously entails issues differ-

provisions of this section to make a custody determination.

ing from a standard custody proceeding, the practice encouraged in the UCCJA regarding courts of the two states conferring and agreeing upon the appropriate forum for jurisdiction would still be prudent. If, for instance, a prior custody proceeding was made (or pending) in one state in accordance with the UCCJA jurisdictional prerequisites and subsequent abuse and neglect occurred in a second state, the evidence surrounding the abuse allegation would exist in that second state. In such instance, the better practice would be for the judges to confer and agree which court should hear the abuse and neglect matter.

### III. Conclusion

In the case sub judice, we conclude that Ohio failed to satisfy the prerequisites for properly assuming jurisdiction over Zachary and that West Virginia was therefore not required to extend full faith and credit to the Ohio custody and adoption proceedings. Ohio would properly have obtained jurisdiction under the UCCJA if it satisfied any of the four criteria outlined in the statute, as quoted above. However, based upon the extensive record before this Court, it does not appear that Ohio could qualify as Zachary's home state at the time of the initiation of the Ohio proceedings, since he had not resided in Ohio for a period of six months prior to the initiation of the Ohio proceedings in November 1995. According to the evidence, Zachary had spent considerable time with Ms. Merritt in June and July 1995 in Huntington, West Virginia, and had lived with his mother in West Virginia in August and September 1995.

Additionally, Ohio would not properly have assumed jurisdiction under 48–10–3(2) since Zachary had no significant connection with Ohio. Only the maternal grandmother's boyfriend permanently resided in Ohio, with Zachary and the grandmother residing in that home on an irregular basis. He had not been abandoned; nor was it necessary in an emergency to protect him, under section 48–10–3(3). Likewise, Ohio could not premise jurisdiction upon 48–10–3(4) regarding the absence of any other state that would have jurisdiction under the UCCJA. An examination of the child's history of various living arrangements would indicate that his substantial connections were in West Virginia.

We conclude that West Virginia is properly vested with jurisdiction over this matter, and we therefore affirm the decision of the lower court.

Affirmed.