**FILED**

**May 27, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**In re J.S., LS., and H.S.**

**No. 21-0627** (Jackson County, 20-JA-85, 20-JA-86, 20-JA-87)

**and**

**State ex rel. D.S. and V.S.,**
**Petitioners,**

**vs.**

**The Honorable Richard A. Facemire,**
**Judge of the Circuit Court of Braxton County, and**
**The West Virginia Department of Health and Human Resources,**
**Respondents.**

**No. 21-0857** (Braxton County, 20-JA-37)

**MEMORANDUM DECISION**

In the first of these consolidated cases, petitioner J.S. ("J.S."),[1] by counsel Ryanne A. Ball, appeals the Circuit Court of Jackson County's July 8, 2021, order entered in an abuse and neglect proceeding instituted on J.S.'s behalf by his counsel. The order memorialized the court's rulings in the case, refusing to adjudicate J.S.'s adoptive parents D.S. and V.S. ("the parents") as abusing or neglecting, accepting the parents' relinquishment of their parental rights to J.S., leaving the issue of sibling visitation between

---

[1] Consistent with our longstanding practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in these consolidated cases. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R.H.*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

J.S. and his sisters, H.S. and L.S., in the parents' sole discretion, and transferring permanency proceedings for J.S. to the Circuit Court of Braxton County. Responses in support of the circuit court's order were filed by the West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Lee Niezgoda; the parents, by counsel Erica Brannon Gunn; guardian ad litem for J.S., Calvin C. Honaker; and guardian ad litem for J.S.'s siblings H.S. and L.S., Julia R. Callaghan.

In the second of the consolidated cases, No. 21-0857, the parents, by counsel Erica Brannon Gunn, filed a petition for writ of prohibition seeking to prevent the Circuit Court of Braxton County from enforcing its October 18, 2021, order entered in the permanency proceedings for J.S., requiring the parents to pay child support and facilitate visitation between J.S. and his siblings, H.S. and L.S. Responses to the petition were filed by J.R., by counsel Ryanne A. Ball; the DHHR, by counsel Patrick Morrisey and Lee Niezgoda; the guardian ad litem for J.S., Kevin W. Hughart; and the guardian ad litem for H.S. and L.S., Julia R. Callaghan.

After considering the parties' written and oral arguments, as well as the appendix records and the applicable law, this Court finds no substantial question of law and no prejudicial error. Upon consideration of the same, we conclude that a memorandum decision affirming the circuit court's order in No. 21-0627 and dismissing the petition for a writ of prohibition in No. 21-0857 as moot is appropriate under Rule 21 of the Rules of Appellate Procedure.

We begin with an overview of the facts and procedural history underlying both cases. Petitioner J.S.,[2] H.S. and L.S. are half-siblings; all have the same mother, but each has a different father. On November 23, 2015, when J.S. was six years old, H.S. was four years old, and L.S. was two years old, abuse and neglect proceedings were instituted against all of their biological parents, which proceedings concluded with the termination of the parental rights of all the biological parents. The appendix record indicates that while they were with their biological parents all of the children, and particularly J.S., had been subjected to abuse and neglect that caused significant trauma and left deep psychological and emotional scars. Respondent D.S. is the paternal grandfather of L.S., the youngest child; he has no biological tie to either J.S. or H.S., and his wife, respondent V.S., has no biological tie to any of the children. Nonetheless, D.S. and V.S. agreed to foster all three

---

[2] J.S. was formerly known as C.A.B.; the parents changed not only his surname but also his first and middle names when they adopted him.

2

children during the pendency of the abuse and neglect proceedings,[3] and on August 22, 2016, the children were ordered to be moved into their home. The parents entered into an Adoption Placement Agreement on August 26, 2016, in regard to the children, and they were ultimately adopted by the parents on January 26, 2018.

From the time the children came to live with D.S. and V.S.,[4] J.S. exhibited worrying behaviors which, if not entirely the result of physical, emotional, and possible sexual abuse he suffered at the hands of his biological parents, were certainly exacerbated by such abuse and were deeply entrenched. Although the parents took a variety of actions designed to help J.S. deal with his emotional and behavioral issues, those issues continued to escalate and, according to the parents, ultimately posed a danger to every member of the family. The parents testified, inter alia, that J.S. tried to burn down the family home on two occasions; that he would hit, choke, and/or threaten his sisters; and that he stated on more than one occasion that he wanted to kill the family. The parents sought help from law enforcement but were told that J.S. was too young to be the subject of a juvenile delinquency petition. They also sought help from the DHHR but were told that "the adoption is final so there's nothing we can do," and that no help was available to the parents unless and until DHHR filed an abuse and neglect petition against them.[5]

After J.S.'s second attempt to burn down the house, which he admitted he had done in order to kill the family, the parents placed him at Highland Hospital in Charleston, West Virginia, where he remained for approximately six weeks. Immediately thereafter, on

---

[3] L.S.'s father's rights were terminated following his voluntarily relinquishment, after which D.S. and V.S. filed a motion to intervene in the abuse and neglect proceedings.

[4] The parents stated in their brief that they "were not told about the severity of JS (sic) mental health struggles and behaviors prior to the adoption[.]" However, they acknowledge that "[p]rior to the adoption, they observed alarming behaviors from JS which included "the destruction of furniture in the family home. JS had also dug holes in the walls of his bedroom and scratched the floor and put holes in his mattress. JS was receiving mental health treatment and they were told that they should expect the behaviors of JS to improve after the adoption[.]"

[5] These statements are in sharp contrast to the representations of DHHR's counsel at oral argument that an "informal procedure" exists whereby adoptive parents can relinquish their parental rights to the DHHR, which then sets about finding a new placement for the child or children. The appendix record contains no information as to the contours of this "informal procedure," or how the DHHR can informally undo an adoption which has been formalized by a court order.

August 12, 2019, the parents placed him at the Fox Run Center for Adolescents ("Fox Run" in St. Clairsville, Ohio, where he remains to this day. On October 9, 2019, the parents filed a juvenile status petition against J.S., which began the sequence of legal events leading to the instant appeal and petition for writ of prohibition.

Following a number of continuances – at least six – the parties convened for a status hearing on March 6, 2020, at which time the parents informed the court that they intended to relinquish their parental rights to J.S. Following several more continuances, at least two of which were attributable to the COVID-19 pandemic, the parties convened again for a hearing at which the parents tendered written voluntary relinquishments of their parental rights to J.S. to the court. Counsel for J.S. objected, arguing that a juvenile status proceeding was an inappropriate forum for relinquishment and that in any event, relinquishment was not in J.S.'s best interests. The court held the matter in abeyance and ordered the parties to submit briefs on the legal issue; however, before the court issued a ruling, counsel for J.S. tendered a verified abuse and neglect petition to the court.[6] The petition alleged that the parents had abandoned J.S., and further alleged that the parents were guilty of abuse and neglect of J.S., H.S., and L.S. by denying them sibling visitation. The court did not enter an order filing the petition; rather, it transferred both the unfiled petition and the pending juvenile status case to the Circuit Court of Braxton County, the county of origin, i.e., the county where the abuse and neglect case against the children's biological parents had been litigated.

On September 17, 2020, the Circuit Court of Braxton County held a hearing, after which it ordered that the abuse and neglect petition be filed. By separate order, the court transferred the juvenile status case back to the Circuit Court of Jackson County, where it is now listed as "Closed" despite the fact that no hearings have ever been held or orders entered in the matter.

On October 7, 2020, on a motion of the parents, the abuse and neglect case was transferred back to the Circuit Court of Jackson County, where it was assigned Case Numbers 20-JA 85, 20-JA-86, and 20-JA-87. On December 22, 2020, the court[7] convened

---

[6] West Virginia Code § 49-4-601 permits either the DHHR or "a reputable person" to file an abuse and neglect petition. The circuit court found, and we agree, that J.S.'s counsel had the statutory authority to file the petition.

[7] Following recusal of the original judge, the case had been reassigned to Judge Anita Harold Ashley of the Fifth Judicial Circuit.

a hearing, held in abeyance J.S.'s counsel's motion to designate the DHHR as a co-petitioner; ordered updated psychological evaluations for all three children; and set the matter for an evidentiary hearing. On January 25, 2021, J.S.'s counsel moved to amend the petition based on information provided to her by D.S. indicating that he intended to travel to the Fox Run facility to tell J.S. that "he and [V.S.] were 'reversing the adoption.'" Counsel immediately sought and was granted an emergency order prohibiting contact between the parents and J.S., and counsel alleged that "since that time, the respondent parents have made no attempt whatsoever to have the Court reverse that order so they could have contact with [J.S.] and instead have focused their entire efforts on voluntarily terminating their rights to him." Counsel cited information contained in the updated psychological reports which suggested the possibility that H.S. and L.S. were being coached by the parents to express fear of their brother, and further alleged that the parents attempted to persuade a forensic interviewer to say that H.S. and L.S. should not have contact with J.S.[8] Immediately thereafter, on January 26, 2021, the parents moved for pre-adjudicatory improvement periods. At a hearing held that same day, the court ordered that the amended petition be filed, that the parties convene a multidisciplinary team ("MDT") meeting to discuss the new allegations and the parents' motion, and that sibling visitation begin in a therapeutic setting.

On March 2, 2021, at the conclusion of a four-hour evidentiary hearing, the circuit court held the parents' request to relinquish their parental rights to J.S. in abeyance, but granted them an improvement period as to the two younger children, L.S. and H.S.[9] Significantly, for purposes of this appeal, the court declined to set the matter for adjudication, as requested by counsel for J.S. Thereafter, on July 6, 2021, another hearing was held at which the court made the following rulings, later memorialized in its July 8, 2021, order: that the court would not adjudicate D.S. and V.S. as abusing parents; that the parents' written voluntary relinquishment of parental rights to J.S. was tendered for the purpose of protecting H.S. and L.S.; that the relinquishment was accepted, and that

---

[8] The interviewer, apparently unpersuaded by what the parents had to say, recommended that some type of visitation be permitted.

[9] Counsel for J.S. implies that this improvement period was, in effect, a sham, as the parents indicated in their testimony that their sole purpose in requesting the improvement period was to prove that the allegations in the abuse and neglect proceeding were not true. Inasmuch as counsel has not raised this issue as a separate assignment of error, we need not venture into this factual/legal thicket.

accordingly all parental rights to J.S. were terminated; that the abuse and neglect petition was dismissed; that J.S. was to remain at Fox Run until an appropriate alternative placement could be found, which the DHHR was ordered to do as soon as possible; that the parents "shall have sole discretion about whether to allow the continued sibling visitation or contact between [H.S.] and [L.S.] and [J.S.]"; and that "[t]his being a disrupted adoption," the matter of J.S.'s permanency was returned to the Circuit Court of Braxton County.

On August 3, 2021, the Circuit Court of Braxton County held a hearing[10] at which it ordered that J.S. undergo a psychological evaluation and that the guardian ad litem[11] interview all three children "as to their desires for sibling visitation[,]" such interviews to be conducted outside the presence of the parents in the case of H.S. and L.S. Thereafter, at a second hearing held on October 5, 2021, the court ordered that the parents transport H.S. and L.S. to Fox Run for visitation with J.S., and that J.S. be transported to Jackson County (or other agreed location) for visitation with H.S. and L.S. The court further ordered that the parents would be required to pay child support for J.S. Finally, the court ordered that the parents were prohibited from discussing anything about J.S. or the case with H.S. and L.S. These rulings were memorialized in an order entered on October 18, 2021.

Because the parents were not parties to the Braxton County proceedings, they had not been given notice of the August 3, 2021, or the October 5, 2021, hearings and were not served with copies of the court's October 18, 2021, order. After DHHR contacted them to schedule visitation, they filed this petition for a writ of prohibition on both procedural and substantive grounds. Specifically, they allege that the circuit court abused its discretion and exceeded its authority by ordering them – nonparties who had no notice or opportunity to be heard – to facilitate sibling visitation and pay child support; and that the court abused its discretion and exceeded its authority by overriding the order of the Circuit Court of Jackson County, which had given them discretion to decide whether there would be sibling visitation.

---

[10] All of the information recited *infra* concerning the Braxton County proceedings was submitted to this Court by counsel for the parents on information and belief, as the parents, having not been parties to the proceedings, have no ability to obtain copies of the lower court's file. In the briefs and oral arguments, no party disputes the representations made by counsel and for purposes of this appeal we take them as accurate.

[11] As noted *supra*, different guardians ad litem were appointed for J.S. in the Jackson County and Braxton County proceedings; however, his siblings H.S. and L.S. had the same guardian ad litem in both proceedings.

The petition for a writ of prohibition was filed in this Court on October 20, 2021. Five days later, on October 25, 2021, the parents filed a motion for stay of the circuit court's order, and on November 8, 2021, the circuit court entered an order setting aside its October 18, 2021, order, and ordering that the parents be served with process and given an opportunity to appear and be heard in the permanency proceedings. Notwithstanding the obvious mootness of the procedural issue set forth in the petition for a writ of prohibition, both the parents and the guardians ad litem request that this Court address the substantive issue: whether the Circuit Court of Braxton County has the authority to revisit the issue of sibling visitation on remand.[12]

**No. 21-0627**

Petitioner J.S. first contends that the circuit court erred and/or abused its discretion in granting the respondents an improvement period, where they made it clear that their intention was to relinquish their parental rights to J.S., *not* to address their alleged abandonment of him. In this regard, J.S. cites *West Virginia Department of Health and Human Resources ex rel. Wright v. Doris S.*, 197 W. Va. 489, 475 S.E.2d 865 (1996) for the proposition that

> in order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable, and in making an improvement period an exercise in futility at the child's expense.

*Id.* at 498, 475 S.E.2d at 874; *see also James M. v. Maynard*, 185 W Va. 648, 656, 408 S.E.2d 400, 408 (1991) ("the abandonment of a child by a parent constitutes compelling circumstances sufficient to justify the denial of an improvement period."). Additionally, J.S. argues that an improvement period should not have been granted because reunification

---

[12] The parents do not make this argument with respect to the payment of child support, as that issue was not addressed by the Circuit Court of Jackson County. Further, although we express no opinion on this issue, we note that the Voluntary Relinquishment tendered by the parents specifically provides, in relevant part, that "[w]e have been told that the termination of our custodial and parental rights may not terminate any responsibility we may have to pay child support and medical support."

7

of the family – a family which still included him – was not the parents' goal; indeed, J.S. alleges, the parents' goal was to destroy the family unit which had been created when they adopted all three children.

Under the unique facts and circumstances of this case, we disagree with J.S.'s assertion that the parents were not entitled to an improvement period as a matter of law. First, J.S. fails to take into account the fact that in the amended petition the parents were alleged not only to have abandoned him, but also to have abused and neglected all three of their adopted children by refusing to allow sibling visitation and by coaching H.S. and L.S. to state – and indeed, to believe – that J.S. posed a danger to them. In his testimony, respondent D.S. acknowledged the allegations of coaching, acknowledged that trying to influence the individual who interviewed H.S. and L.S. was "probably . . . a mistake," *see supra* note 8, and stated that "if there's anything they [DHHR] can say or do to help us be better parents, I'm all for that." Based on these and other representations, the court concluded that the requirements of West Virginia Code § 49-4-610(1)(A) to -(B)[13] had been met, as the parents had filed a written motion requesting the improvement period and demonstrated that they were likely to fully participate therein. Therefore, the court had discretion to grant a preadjudicatory improvement period.

As J.S. further argues, this Court has held that "[t]he goal of an improvement period is to facilitate the reunification of families whenever that reunification is in the best interests of the children involved." *State ex rel. Amy M. v. Kaufman*, 196 W. Va. 251, 258, 470 S.E.2d 205, 212 (1996). However, this generally applicable principle cannot be applied

---

[13] West Virginia Code § 49-4-610 provides, in relevant part:

> (1)    *Preadjudicatory improvement period*. -- A court may grant a respondent an improvement period of a period not to exceed three months prior to making a finding that a child is abused or neglected pursuant to section six hundred one [§ 49-4-601] of this article only when:
>
> (A)    The respondent files a written motion requesting the improvement period;
>
> (B)    The respondent demonstrates, by clear and convincing evidence, that the respondent is likely to fully participate in the improvement period and the court further makes a finding, on the record, of the terms of the improvement period[.]

8

so rigidly as to strip a circuit court of its "considerable flexibility" in working its way to a fair resolution in a difficult case such as the one at bar. *Id*. Only "[w]here it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected has been *substantially disregarded or frustrated*," Syl. Pt. 5, in part, *In re Edward B*., 210 W. Va. 621, 558 S.E.2d 620 (2001) (emphasis added), will this Court reverse and remand "for compliance with that process and entry of an appropriate dispositional order." *Id*. This is not such a case.

J.S. next argues that the circuit court erred and/or abused its discretion in allowing the parents to relinquish their parental rights without first proceeding to adjudication and disposition. In support of his argument, petitioner cites this Court's decisions in *In re T.W*., 230 W. Va. 172, 737 S.E.2d 69 (2012) and *In re Marley M*., 231 W. Va. 534, 745 S.E.2d 572. We conclude that neither decision governs the resolution of this case.

In *T.W*., the respondent father had four children, the two older ones living in West Virginia and the two younger ones living in Maryland with their mother. The abuse and neglect petition alleged numerous instances of physical and sexual abuse of the two older children, horrific conditions of neglect, and abandonment. Additionally, although no allegations specific to the younger children were set forth in the petition, their mother had obtained an order prohibiting any further visitation because the boyfriend of one of the older children had raped one of the younger children when she was visiting her father in West Virginia; and further, a Maryland court had stayed the father's and mother's divorce proceeding pending the outcome of the West Virginia abuse and neglect proceeding. 230 W. Va. at 177, 737 S.E.2d at 74. At a hearing held at the outset of the proceeding, the father offered to relinquish his parental rights to the two older children, but the offer was specifically made contingent on the absence of any further proceedings. For reasons not apparent on the face of the record, the circuit court granted the relief sought, dismissing the younger children from the proceeding and accepting the father's relinquishment of parental rights to the older children without further inquiry. *Id*. The mother of the two younger children appealed, and this Court reversed, holding that

> [i]n the case sub judice, grievous allegations of abuse and neglect were raised, and the potential still exists for future visitation between John W. and the two children to whom his parental rights were not terminated. The granting of a consensual termination of parental rights without investigation into those allegations or findings with regard to the best

9

interests of *all four* of these children is inconsistent with both the mandate of the statutes articulating the protocol for abuse and neglect cases and the prior cases decided by this Court.

*T.W.*, 230 W. Va. at 180, 737 S.E.2d at 77.

In *Marley M.*, after the mother had relinquished her parental rights to her child, the circuit court proceeded directly to disposition and denial of post-termination visitation. 231 W. Va. at 541, 745 S.E.2d at 579. The mother appealed, contending that under *T.W.* she was entitled to adjudication notwithstanding her voluntary relinquishment. This Court agreed, holding that

[w]here during the pendency of an abuse and neglect proceeding, a parent offers to voluntarily relinquish his or her parental rights and such relinquishment is accepted by the circuit court, such relinquishment *may*, without further evidence, be used as the basis of an order of adjudication of abuse and neglect by that parent of his or her children.

*Id*. at 535, 745 S.E.2d at 574, Syl. Pt. 4 (emphasis added).

J.S. reads *T.W.* and *Marley M.* as establishing a hard-and-fast rule – that relinquishment *must* be used as the basis of an order adjudicating the parents of abuse and neglect based on abandonment – without any consideration of the very different factual situation presented in this case. In *T.W.*, we concluded that the father's relinquishment of parental rights to his two older children, without adjudication and disposition, was wholly insufficient to protect the rights not only of those children but also of the two younger children who lived in Maryland. 230 W. Va. at 180, 737 S.E.2d at 77. In *Marley M.*, our focus was on balancing the rights of the accused parent, whose voluntary relinquishment was intended to avoid potential self-incrimination, and the rights of the State, which desired to establish precedent which could affect "any other, or after born, children." *Marley M.*, 231 W. Va. at 543, 745 S.E.2d at 581. None of these considerations are present in the instant matter, where it is clear that the parents did not "abandon" J.S. in any commonly understood meaning of that word.[14] Rather, they spent years, both before and after adopting

---

[14] *See* text *infra.* The petitioner argues that the parents abandoned him when they placed him at Fox Run and announced their intention to relinquish their rights to him, citing West Virginia Code § 49-1-201 which defines abandonment as "any conduct that demonstrates the settled purpose to forego the duties and parental responsibilities to the

him, trying to integrate him into their family and to find treatment modalities for his mental and emotional issues. Only after his behaviors caused them to fear for their safety and for the safety of their daughters, H.S. and L.S., did they take the extreme step of putting him in a facility specifically equipped to treat him. Critically, J.S.'s guardian ad litem has concluded that it would not be in his best interest to return to the family home, adjudication or no adjudication, and indeed, no one in this case has argued (or even voiced) a contrary position. Further, J.S.'s counsel acknowledged at oral argument that adjudication of the parents would make no difference in J.S.'s case and serve no purpose whatsoever. *See In re D.P.*, 230 W. Va. 254, 257 & n.3, 737 S.E.2d 282, 285 & n.3 (2012) (distinguishing *T.W.* on the ground, inter alia, that "[a]t no time did the Department justify how the child's health, welfare or best interests would be promoted by further adjudication on the petition."). For these reasons, although we do not in any way modify the legal principles established in *T.W.* and *Marley M.*, we find that these precedents do not dictate reversal under the unique facts and circumstances of this case. The circuit court's decision to dismiss the abuse and neglect proceeding without adjudication or disposition was within the court's sound discretion, as strict adherence to *T.W.* and *Marley M.* would have prejudiced the non-abusing parents while doing nothing to advance J.S.'s interests.

J.S. next argues that the circuit court erred and/or abused its discretion in allowing the parents to have sole discretion regarding future visitation between J.S. and his sisters, H.S. and L.S. – knowing that the parents were adamantly opposed to visitation – in the absence of a finding that separation was in the siblings' best interests. In this regard, this Court has held that

> [i]n cases where there is a termination of parental rights, the circuit court should consider whether continued association with siblings in other placements is in the child's best interests, and if such continued association is in such child's best interests, the court should enter an appropriate order to preserve the rights of siblings to continued contact.

---

child[.]" In contrast, the parents contend that this issue has already been decided in *State ex rel. Paul v. Hill*, 201 W. Va. 248, 496 S.E.2d 198 (1997), where this Court held that "[a] parent's relinquishment of his/her parental rights . . . as a part of previously initiated adoption proceedings does not constitute abandonment for abuse and neglect purposes." *Id*. at 250, 496 S.E.2d at 200, Syl. Pt. 4, in part. Although we acknowledge that the statutory definition contained in section 49-1-201 postdates *Paul* and may therefore affect the Court's reasoning in that case, we need not determine the continuing vitality of *Paul* in order to resolve the issues raised in the instant case.

*James M. v. Maynard*, 185 W. Va. at 649, 408 S.E.2d at 401, Syl. Pt. 4. In a long line of precedents since *James M.*, we have emphasized that children's associational rights with their siblings must be considered in abuse and neglect cases. *See*, *e.g.*, *In re N.A.*, 227 W. Va. 458, 468, 711 S.E.2d 280, 290 (2011) ("where siblings have been together their entire lives, there is a strong presumption that it is in the best interests of the children that they maintain their sibling relationship through continued visitation if possible."); *In re Desarae M.*, 214 W. Va. 657, 659, 591 S.E.2d 215, 217 (2003) ("In cases where there is a termination of parental rights, the circuit court should consider whether continued association with siblings in other placements is in the child's best interests, and if such continued association is in such child's best interests, the court should enter an appropriate order to preserve the rights of siblings to continued contact.") (citation omitted); *cf. Kristopher O. v. Mazzone*, 227 W. Va. 184, 195, 706 S.E.2d 381, 392 (2011) ("Clearly '[t]he best interests of a child are served by preserving important relationships in that child's life.'") (citing Syl. Pt. 2, *State ex rel. Treadway v. McCoy,* 189 W.Va. 210, 429 S.E.2d 492 (1993)).

Once again, we must emphasize that this abuse and neglect proceeding was unique and unusual, *see* text *supra*, and the question of sibling visitation in this case was a procedural Gordian knot. Once the circuit court had dismissed the abuse and neglect petition, the issue of sibling visitation for H.S. and L.S. raised a question as to "whether the circuit court had the statutory authority to limit [the parents'] rights as . . . adoptive parent[s], a question which has a constitutional dimension in that it implicates "the fundamental right of a parent to make decisions concerning the care, custody, and control of his or her children." *In re J.S.*, 245 W. Va. 164, 168, 858 S.E.2d 214, 218 (2021) (citations omitted). Further, once the court had accepted the parents' voluntary relinquishment of their parental rights to J.S., the issue of sibling visitation for him became an issue to be considered in connection with his permanency proceedings – proceedings which were transferred to the Circuit Court of Braxton County as the court of origin. Under these circumstances, and in light of the fact that no party squarely raised these issues below or squarely addressed them on appeal, this Court cannot find that the circuit court's failure to make "best interests" findings concerning visitation was reversible error.

Finally, J.S. contends that the circuit court erred and/or abused its discretion in finding that the parents' voluntary relinquishment of parental rights was a "disrupted adoption." We agree that this terminology does not apply in the instant case, where J.S. was adopted on January 16, 2018, and his adoptive parents first announced their intention to relinquish their parental rights to him on March 6, 2020, more than two years later. It seems clear that the circuit court seized on this nomenclature in an attempt to fit the parents'

relinquishment of parental rights into some sort of legal framework – a framework which does not exist or, if it does, was not followed in this case, as all parties agree.[15]

Counsel for the DHHR contends that because the Legislature has acknowledged the concept of "relinquish[ment] from an adoptive home[,]"[16] this Court has the authority to establish a process whereby adoptive parents can voluntarily relinquish their rights to a child at any time, for good cause shown, notwithstanding the provisions of West Virginia Code § 48-22-704 governing the finality of orders of adoption. Inasmuch as all parties agree that the parents did not attempt to utilize any such process, choosing instead to file a juvenile status proceeding and then being named as respondents in an abuse and neglect proceeding filed by counsel for J.S., we decline to address this issue. *See* Syl. Pt. 1, in part, *State ex. rel. Perdue v. McCuskey*, 242 W. Va. 474, 836 S.E.2d 441 (2019) ("'Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes. The pleadings and evidence must present a claim of legal right asserted by one party and denied by the other before jurisdiction of a suit may be taken.'") (citations omitted).

This was a difficult case in which everyone involved, the parties, the attorneys, and the circuit court, worked diligently to achieve a result that was in the best interests of all three children, J.S., H.S., and L.S. For the reasons given, we affirm the judgment of the Circuit Court of Jackson County in No. 21-0627.

### No. 21-0857

As set forth *supra*, on November 8, 2021, the Circuit Court of Braxton County entered an order setting aside its October 18, 2021, order, and ordering that the parents,

---

[15] At oral argument all counsel agreed on one thing: that this case was and is "a procedural mess."

[16] West Virginia Code § 49-4-606(b) provides that

> [i]f the child is removed or relinquished from an adoptive home or other permanent placement after the case has been dismissed, any party with notice thereof and the receiving agency shall promptly report the matter to the circuit court of origin, the department and the child's counsel, and the court shall schedule a permanency hearing within sixty days of the report to the circuit court, with notice given to any appropriate parties and persons entitled to notice and the right to be heard. The department shall convene a multidisciplinary treatment team meeting within thirty days of the receipt of notice of permanent placement disruption.

D.S. and V.S., be served with process and given an opportunity to appear and be heard in the permanency proceedings for J.S. Notwithstanding the obvious mootness of the procedural issue set forth in the petition for a writ of prohibition, both the parents and the guardians ad litem request that this Court address the substantive issue: whether the court has the authority to revisit the issue of sibling visitation on remand.

On the record before us, we decline to address this multi-faceted issue. Given what could be the competing best interests of J.S., H.S., and L.S., the rights of the adoptive parents as explicated in *In re J.S.*, and the existence of legal and factual questions as to possible application of res judicata, collateral estoppel, and/or law of the case, the Circuit Court of Braxton County is best situated to resolve these issues in the first instance, on a fully developed record and with all affected parties having notice and an opportunity to be heard.

For the reasons given, the petition for a writ of prohibition is dismissed as moot.

No. 21-0627, Affirmed.
No. 21-0857, Dismissed as moot.

**ISSUED:** May 27, 2022

**CONCURRED IN BY:**

Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton

Justice C. Haley Bunn did not participate in the decision in this case.

**WRITING SEPARATELY:**

Chief Justice John A. Hutchison

14

Hutchison, Chief Justice, concurring:

In these consolidated cases, the adoptive parents were faced with an untenable decision to relinquish their parental rights to a child they had adopted following an abuse and neglect proceeding but who was so troubled by his circumstances the family simply could not safely coexist in the same household. The adoptive parents were then sent on an unnecessarily fruitless quest that traversed and re-traversed two different counties' circuit courts and has resulted in protracted litigation in this Court, all to accomplish what should have been possible to achieve through a simple motion presented to just one of these tribunals. Finally, the parties presented these consolidated cases, from two different circuit courts, to this Court from this confusing and complicated procedural quagmire all because the lower courts, the bar, and the DHHR were uncertain how to proceed when the adoptive parents decided they had to relinquish their parental rights to J.S.

But the resolution of these cases should not have been so difficult because the West Virginia Legislature very specifically has contemplated this very scenario and provided direction as to where to file a proceeding in which an adoptive parent, who has adopted a child following an abuse and neglect proceeding, finds it necessary to relinquish his or her parental rights to that child: West Virginia Code § 49-4-606(b) (2015). In like fashion, this Court has established the procedure to be followed for requesting relief in abuse and neglect cases, including the situation presented by the cases sub judice where such relief is sought following the achievement of permanency in an abuse and neglect proceeding: Rule 17(c)(1) of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings.

While I agree with the Court's ultimate decision of these cases, it is apparent that clear guidance is needed because these procedures were not followed in the underlying proceedings. Accordingly, I feel compelled to concur and write separately to provide such procedural clarity to the bench, the bar, and the DHHR so that when they are faced with these unique situations, the cases can be more expediently resolved to ensure that the child or children involved can more quickly re-achieve certainty and finality through a new permanent placement.

Faced with what was undoubtedly an exceedingly difficult decision, the adoptive parents felt it necessary to relinquish their parental rights to their adopted child after he twice tried to set fire to their home, while family members were inside. In the context of these circumstances, the adoptive parents hoped that, through relinquishment, they would be able to protect the child, the child's siblings, and the adoptive parents, themselves, from the child's dangerous and destructive behaviors. To accomplish this modification of the child's permanent placement, the adoptive parents sought direction from various entities, including the DHHR, which is charged with facilitating permanency planning of relinquished children under the governing statute, and finally were instructed to file a juvenile status petition, not a motion to modify as contemplated by West Virginia Code § 49-4-606. After following these directives, the adoptive parents then were told, first, that

15

their relinquishment could only be accomplished through the filing of an abuse and neglect proceeding, and, second, that the abuse and neglect case then needed to be transferred to the county in which the initial abuse and neglect proceeding giving rise to their adoption of the child had originated. Once the case had been transferred to the court of origin, the origin court transferred the case back to the residential county of the adoptive parents because, in its opinion, that county would be a more appropriate jurisdiction to hear the case because it presumably was the location of the events giving rise to the newly-filed abuse and neglect petition. Then, once the abuse and neglect case had proceeded through the adoptive parents' pre-adjudicatory hearing, the presiding court accepted the adoptive parents' relinquishment of their parental rights to J.S. but again transferred the case to the court of origin, this time for permanency proceedings. Not only are these numerous case transfers evidence of the lack of clarity of the proper procedure to follow in such circumstances, but they also needlessly delay the resolution of such proceedings and the re-establishment of permanency for the affected child contrary to this Court's repeated admonitions that abuse and neglect cases shall be resolved as expeditiously as possible. *See, e.g.,* Syl. pt. 5, *In Interest of Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991) ("The clear import of the statute [West Virginia Code § 49-6-2(d), now West Virginia Code § 49-4-601(j)] is that matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis, and it clearly reflects the goal that such proceedings must be resolved as expeditiously as possible.").

Instead, the procedure that should have been followed in these cases is simple. Pursuant to Rule 17 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, "[a]n application to the court for an order shall be by motion." W. Va. R. Proc. Child Abuse & Neglect Proceeds. 17(c)(1). This Rule further explains that the motion, "which, unless made during a hearing or trial, shall be made in writing" and "shall state with particularity the grounds therefor, and shall set forth the relief or order sought." *Id.* Here, the adoptive parents sought to modify the child's permanent placement, *i.e.* their adoption of the child, that had resulted from the termination of the parental rights of the child's biological parents. Therefore, pursuant to Rule 17(c)(1), the adoptive parents, who wished to modify the child's permanent placement through the relinquishment of their parental rights, should have filed a motion to modify the child's permanent placement. While the specific procedure has not been explicitly identified, *i.e.* the aforementioned motion to modify permanent placement, it is clear that the Legislature nevertheless has contemplated the precise proceedings that are necessary to accomplish this type of modification under facts similar to those at issue herein through its enactment of West Virginia Code § 49-4-606(b):

> *If the child is* removed or *relinquished from an adoptive home* or other permanent placement *after the case has been dismissed*, any party with notice thereof and the receiving agency shall promptly report the matter to the circuit court of origin, the department and the child's counsel, and the court shall schedule a permanency hearing within sixty days of the report to the

16

circuit court, with notice given to any appropriate parties and persons entitled to notice and the right to be heard. The department shall convene a multidisciplinary treatment team meeting within thirty days of the receipt of notice of permanent placement disruption.

(Emphasis added).

Such a motion to modify permanent placement also is consistent with the Legislature's recognition that a review of a child's permanency may be requested "at any time" and this Court's rule that substantially mirrors the language of § 49-4-606(b). *See* W. Va. Code § 49-4-608(i) (2019) ("Nothing in this article precludes any party from petitioning the court for review of the child's case at any time. The court shall grant the petition upon a showing that there is a change in circumstance or needs of the child that warrants court review."). *See also* W. Va. R. Proc. Child Abuse & Neglect Proceeds. 45(b) (limiting procedure to cases involving removal as opposed to both removal and relinquishment, but providing that "If the child is removed from an adoptive home or other permanent placement after the case has been dismissed, any party with notice thereof and the receiving agency shall promptly report the matter to the circuit court of origin, the Department, and the child's counsel, and the court shall schedule a permanent placement review conference within sixty (60) days, with notice given to any appropriate parties and persons entitled to notice and the right to be heard. The Department shall convene a multidisciplinary treatment team meeting within thirty (30) days of the receipt of notice of permanent placement disruption.").

Finally, jurisdiction of such proceedings is proper in the court of origin, as directed by § 49-4-606(b), because circuit courts retain jurisdiction over "requests for modification" made after the conclusion of an abuse and neglect proceeding including "changes in permanent placement" of the subject child(ren). W. Va. R. Proc. Child Abuse & Neglect Proceeds. 6. *Accord In re J.L.*, 234 W. Va. 116, 122, 763 S.E.2d 654, 660 (2014) ("Insofar as the authority to determine matters involving the abuse and/or neglect of a child is reposed in the circuit court, . . . continuing jurisdiction over such cases likewise is vested in the circuit court." (citation omitted)).

In clarifying the procedures that should have been followed in these cases, let me be clear that I by no means wish to encourage parents who have adopted children, following the termination of the children's parents' rights, to relinquish their parental rights the moment a child exhibits bad behavior or otherwise becomes incorrigible. However, where, as here, the child's interactions with the adoptive family rise to the level of posing a real and repeated threat to the health and safety of other children in the home, the adoptive family, the child sought to be relinquished, and the home itself, such extreme circumstances warrant resort to the court of origin through a modification of permanent placement motion to ensure that the child receives the necessary "safety and guidance" as well as to protect "the mental and physical welfare of the child" in accordance with the legislative objectives

17

of child welfare proceedings. W. Va. Code §§ 49-1-105(b)(1, 2) (2015). Because these cases involve those extreme circumstances where the best interests of the child ultimately will be served by accepting the adoptive parents' relinquishment of their parental rights to the child amidst an environment of such animosity between the parties that it no longer is safe for the child to reside in their household, I concur with the majority's decision in these cases affirming the final order of the Circuit Court of Jackson County. I further agree with the majority's dismissal as moot of the original jurisdiction proceeding arising from the Circuit Court of Braxton County in light of that court's issuance of its subsequent order.